In the Matter of The CENTRAL RAIL-
ROAD COMPANY OF NEW
JERSEY, Debtor.

Appeal of STATE OF NEW JERSEY,
No. 73–1006.

Appeal of COMMONWEALTH OF PENN-
SYLVANIA and Pennsylvania Public
Utility Commission, No. 73–1027.

Nos. 73–1006 and 73–1027.

United States Court of Appeals,
Third Circuit.

Argued March 1, 1973.

Reargued May 23, 1973.

Decided Aug. 27, 1973.

Certiorari Denied Jan. 7, 1974.

See 94 S.Ct. 870.

Stephen Skillman, Asst. Atty. Gen., Trenton, N. J., for appellant in No. 73–1006.

Gordon P. MacDougall, Sp. Asst. Atty. Gen., Washington, D. C., for appellants in No. 73–1027.

Jacob I. Goodstein, Goodstein, Zamore, Mehlman & Krones, New York City, for 3¼% Mortgage Bondholders Protective Committee.

Roger C. Ward, Pitney, Hardin & Kipp, Newark, N. J., for Manufacturers Hanover Trust Co., indenture trustee.

Stanley Weiss, Carpenter, Bennett & Morrissey, Newark, N. J., for trustee of Central R. R. Co. of N. J.

Before SEITZ, C. J., and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, JAMES HUNTER, III and WEIS, Circuit Judges.

ADAMS, Circuit Judge:

May a district judge presiding over a railroad reorganization, pursuant to Section 77 of the Bankruptcy Act,[1] permit the Trustees of the railroad to discontinue a loss-producing service or must he withhold his authorization until the Trustees have applied to federal or state regulatory agencies for permission to terminate the service?

The State of New Jersey answers that permitting the discontinuance before administrative review would thwart any attempt to create a viable rail system essential to the economic life of the region. The Trustees of the Central R.

Co. of New Jersey, by way of rejoinder, assert that denying the request for discontinuance could result in an unconstitutional taking of property. Resolution of this appeal requires this Court to address these contentions.

I.

The Central Railroad of New Jersey (Central) is one of the many railroads[2] in the Northeast that is presently undergoing reorganization pursuant to section 77 of the Bankruptcy Act. The Central's lines, prior to entry into reorganization, extended from the Newark-Jersey City area in Northeastern New Jersey west to the northeast corner of Pennsylvania[3] (the "hard coal region") and south to Southern New Jersey, ending near the Delaware Bay.

The majority of the customers served by the Central are located in the Northern New Jersey metropolitan area. In that region, the Central provides shipping services for industry and, more significantly for this appeal, carries approximately 25,000–30,000 riders a day.[4] The vast majority of these riders are commuters who use the train to travel from western and southern suburbs into Newark or Jersey City. Many of these commuters continue to New York, using other public transportation facilities.

The State of New Jersey has for a number of years provided subsidies to the several railroads that transport commuters in New Jersey. Since the entry of the Central into reorganization in March, 1967, that railroad has received annual subsidies from the state ranging from a high of $5,100,000 in 1972 to a low of $4,400,000 in 1970. The granting of the subsidy has been made pursuant to

---

1. 11 U.S.C. § 205.

2. Other railroads which have begun court-supervised reorganizations include the Penn Central, Lehigh & Hudson River, Reading, Lehigh Valley, Erie Lackawanna, New Hope & Ivyland, New Haven and the Boston & Maine.

3. The Pennsylvania service of the Central was terminated pursuant to Order No. 445

of the Reorganization Court, issued December 20, 1971. The Order was affirmed by this Court, In Matter of Central R. Co. of New Jersey, 455 F.2d 989 (3d Cir. 1972).

4. A rider is a passenger on a one-way trip. A commuter who rides the train to work in the morning and from work in the evening would be counted as two riders.

contracts entered into between the railroad and the state acting through its Commuter Operating Agency. Many of the terms of the contracts are prescribed by statute. In July of 1972, the railroad and the state contracted for the Central to continue to furnish passenger service through June 30, 1973. The railroad was obligated to run trains according to an agreed upon schedule and compensation was to be paid by the state on the basis of the railroad's "avoidable loss" for the preceding year.[5] Article Seventeenth of the contract provided:

> "Each party reserves the right to cancel this agreement at the end of any calendar month upon 30 day's notice to the other party." [6]

Alleging that the subsidy paid by the state was inadequate to compensate the railroad, the Trustees petitioned the reorganization court for permission to exercise their right of cancellation under the contract and to terminate all their passenger services in New Jersey.

The district court, in an order dated December 20, 1972,[7] based on an oral opinion delivered earlier,[8] granted the Trustees' petition, and ordered termination of all passenger service as of January 21, 1973. The district court's order was appealed to this Court and a panel of the Court relying on a brief per curiam opinion permitting suspension of the Central's Pennsylvania operations,[9] affirmed the decision of the district court.

The State of New Jersey and the Commonwealth of Pennsylvania [10] filed petitions for rehearing before the Court En Banc. The petitions were granted and argument before the Court En Banc was had on May 23, 1973.[10a] The termination of passenger service has been stayed pending resolution of this appeal.[11] Such resolution is now incumbent upon us.

## II.

The Trustees first contend that we must affirm the district court because the Court is bound by the doctrines of "law of the case" and *stare decisis* to follow its earlier decision permitting the suspension of service in Pennsylvania.[12] This contention is without merit, for it has long been the rule in this Circuit that decisions made in similar cases [13] by panels of this Court

---

5. The "avoidable loss" figure is computed by determining whether a particular cost would be avoided if passenger service were discontinued.

   Under a "full cost" compensation program, the railroad is reimbursed for all expenses involved in operating the passenger service not just those which are attributable exclusively to that service.

   Thus, under the full cost system the railroad is compensated pro rata for management expenses, depreciation and debt service. These items, if not directly related to the provision of passenger service, would be uncompensated under the "avoidable loss" program.

   By statute, New Jersey has changed its compensation within the past year from "avoidable loss" to "full cost."

6. Appendix at 25a.

7. Order No. 547, Appendix at 435a.

8. Appendix at 423a.

9. In Matter of Central R. Co. of New Jersey, 455 F.2d 989 (3d Cir. 1972). (The panel consisted of Circuit Judges Maris and Aldisert and District Judge Gorbey.)

10. Pennsylvania's interest in the termination arises from the existence of four trains a day between Philadelphia and Newark, which are operated jointly by the Reading Railroad and the Central. Pennsylvania's argument parallels New Jersey's, and future reference will be to New Jersey only.

10a. Judge Maris did not sit with the Court En Banc because of a temporary illness. Judge Gorbey did not sit since district judges are not authorized to sit on en banc rehearings in the Court of Appeals.

11. *See* N.Y. Times, July 1, 1973, at 25, col. 8.

12. In Matter of Central R. Co. of New Jersey, 455 F.2d 989 (3d Cir. 1972).

13. The similarity of this case with the cause involving terminations in Pennsylvania is not sufficiently great to permit the invocation of the doctrine of "preclusion" against New Jersey. Scarano v. Central R. Co. of New Jersey, 203 F.2d 510 (3d Cir. 1953), indicates the greater congruence necessary for the doctrine to be operative.

are binding on other panels but are not controlling on the Court En Banc. Indeed, it is *only* through the Court En Banc that precedents established by earlier panel decisions may be reexamined.[14]

In addition, the Pennsylvania case is distinguishable from this appeal. The former decision authorized suspension of certain passenger services pending ICC action on applications for abandonment of such service, which action was arguably unduly delayed. In the present case, however, the Trustees have not filed applications with either the ICC or state regulatory authorities.

### III.

A review of the earlier decision must begin with an examination of the railroad reorganization statute and proceed to an explication of the relationship between administrative agencies and a district court supervising a railroad reorganization under that statute.

The decision to permit termination was made by the district court in December, 1972. At that time, the Trustees had not sought approval for the termination of passenger service in any forum other than the district court. No action had been commenced before the New Jersey regulatory agencies; no abandonment proceedings had been initiated before the Interstate Commerce Commission.[15]

■ A termination of passenger service is an action that may not fall squarely within the ambit of statutes which control abandonments of railroad lines or portions thereof.[16] However, whether the termination is or is not denominated an abandonment, prior administrative approval appears mandated before a district court overseeing a reorganization may permit the discontinuance of an important component of a region's rail service.[16a]

■ Section 77(*o*) provides that the district court may permit abandonment of "lines or portions of lines of railroad." It states in pertinent part:

"(*o*) The trustee or trustees, from time to time, shall determine what lines or portions of lines of railroad and what other property of the debtor, if any, should be abandoned or sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall present to the judge petitions, in which other parties in interest may join, for authority to abandon or to sell any such property; and upon order of the judge made after a hearing pursuant to such reasonable notice by publication or otherwise as the judge may direct to parties in interest, authorizing any such abandonment or sale, but only with the approval and authorization of the Commission when required by chapter 1 of Title 49, as amended February 28, 1920, or as it may be hereafter amended. . . . ." [17]

As section 77(*o*) makes clear, if the railroad is subject to the jurisdiction of the

14. *See e.g.*, United States ex rel. Reed v. Anderson, 461 F.2d 739 (3d Cir. 1972), overruling, United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970).

15. A reorganization plan had been filed by the Trustees with the ICC in August, 1971. But such plan, which is still pending before the ICC, included continued passenger service, not termination of such service. Brief of Appellants at 2.

16. *See e.g.*, Section 77(*o*), 11 U.S.C. § 205(*o*). *Compare* Smith v. Hoboken R. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946), *with* Board of Public Utility Com'rs of New Jersey v. United States, 158 F.Supp. 98 (D.N.J.1958), *prob juris noted*, 357 U.S. 917 (1958), dismissed as moot, 359 U.S. 982, 79 S.Ct. 939, 3 L.Ed.2d 932 (1958).

16a. For the purposes of the present appeal, this Court has assumed that the district court would have the power to permit termination of certain rail services if such termination had been approved by the appropriate administrative agency.

17. 11 U.S.C. § 205(*o*).

ICC, no abandonment may take place without the approval of that agency.[18]

If the termination of passenger service is not denominated an abandonment, or if the Central's service is not subject to the purview of the ICC,[19] the requirement of ICC approval mandated by section 77(o) would appear not to apply. Nonetheless, the district court may not be free to permit termination without prior administrative approval.

New Jersey has developed its own administrative agencies that regulate the conduct of certain railroads within the state. Approval of the appropriate agency is required under New Jersey law before any service may be discontinued.[20] If the approval of the state agency is withheld or unduly delayed, under a special provision recourse may be had to the ICC.[21]

The Supreme Court has explicitly stated that compliance with a state's regulatory program is required of railroads undergoing reorganization.

Palmer v. Massachusetts [22] involved an attempt by the Trustees of the New Haven Railroad to terminate passenger service to eighty-eight stations in the Boston region. To effectuate such a termination, the Trustees, as required by state law, began proceedings before the Massachusetts Department of Public Utilities. While the state hearings were being conducted, the Trustees applied to the district judge supervising the reorganization for permission to carry out the same terminations. The district court, "ruled that § 77 gave him the responsibility of disposing of the petition on its merits and, having taken evidence, gave the very relief for which the Trustees had applied to the Department and which was still in process of orderly consideration." [23] The U.S. Court of Appeals for the Second Circuit reversed,[24] and the Supreme Court affirmed that reversal.

In holding that the district court supervising the reorganization did not have the power to permit terminations in derogation of state regulatory procedures,[25] the Supreme Court, speaking through Justice Frankfurter, strongly emphasized the importance of preserving state control in the first instance:

"In view of the judicial history of railroad receiverships and the extent to which § 77 made judicial action dependent on approval by the Interstate Commerce Commission, it would violate the traditional respect of Congress for local interests and for the administrative process to imply power in a single judge to disregard state law over local activities of a carrier the governance of which Congress has withheld even from the Interstate Commerce Commission, except as part of a complete plan of reorganization for an insolvent road." [26]

---

18. This Court has recently discussed at some length, the role of subsection (o) in the general scheme of section 77. See In Matter of Penn Central Transportation Co. (Sale of Park Avenue Properties), 484 F.2d 323 (3d Cir. filed June 14, 1973). Whether the import of that case, limiting extensive sales dispositions made pursuant to a reorganization plan, would affect abandonments made with ICC approval but not following a plan of reorganization is a question not involved in the resolution of this case.

19. It may be contended that since the operations are intrastate, they are not subject to ICC control.

20. If, as is true here, the termination is of passenger service provided under a contract involving public funds, approval of the Commuter Operating Agency would be necessary.

N.J.S.A. 27:1A–24. Were public funds not involved, application must be made to the Board of Public Utility Commissioners. N.J.S.A. 48:2–13.

21. 49 U.S.C. § 13a(2).

22. 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939).

23. Palmer v. Massachusetts, 308 U.S. 79, 83, 60 S.Ct. 34, 36, 84 L.Ed. 93 (1939).

24. Converse v. Massachusetts, 101 F.2d 48 (2d Cir. 1939).

25. Terminations made pursuant to a plan of reorganization do not need state approval. Section 77(f), 11 U.S.C. 205(f).

26. 308 U.S. at 88, 60 S.Ct. at 38 (citation omitted).

It may be argued that the crisis now confronting the eastern railroads and the great changes that have come about in the economy generally, and to the railroad industry in particular, require a different result from that reached in *Palmer*. However, the blunt fact is that Palmer has not been undercut by subsequent decisions of the Supreme Court, nor has its vitality been called into question.

One aspect of Palmer v. Massachusetts has, in fact, been strongly reiterated in the New Haven Inclusion Cases.[27] There, the Supreme Court emphasized the important role of a regulatory agency, the ICC,[28] in the administration and resurrection of railroads in reorganization.[29]

In the present case, the district court approved the termination of the passenger service without having required that the proposal first be submitted to an appropriate regulatory agency. Unless this case is not controlled by section 77(*o*) or Palmer v. Massachusetts, it would appear that the district court's action was not proper.

## IV.

The Trustees contend that termination must be permitted at this time, without agency consideration. Such termination, they assert, is necessary to stop the financial drain on the railroad, which has risen to such magnitude as to be an unconstitutional taking of property.

Underlying the taking argument is the basic principle that an owner of property retains the right ultimately to withdraw that property from a losing venture.[30] Indeed, such a right appears to be a fundament of the taking provision.[31] Operation of the passenger services, if not more adequately compensated, would, at some point, so substantially reduce the assets remaining in the railroad that the continuation would constitute a taking.

The Trustees might contend that a requirement that they seek relief now from the appropriate agency would result in further delay in termination and that any delay would exacerbate an already critical financial situation. They might further argue that the resort to New Jersey agencies would most likely provide only frustration, and therefore would be an empty formality.

However, the fact remains that the Trustees have not sought relief from the appropriate agency. There having been no application made, there can be no showing that delay[32] or frustration[33] would be the inevitable result.

---

27. 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

28. The ICC can play a role in termination proceedings committed in the first instance to state regulatory agencies. *See* 49 U.S.C. § 13a(2). That section was added to the statute in 1958, to permit ICC action in the event of adverse state agency actions. Thus, there was no role for the ICC at the time of Palmer v. Massachusetts.

29. New Haven Inclusion Cases, 399 U.S. 392, 431, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

30. *See* Note, Takings and the Public Interest in Railroad Reorganization, 82 Yale L.J. 1004 (1973). The Note describes the practice followed in the New Haven Railroad's reorganization wherein the continued operation of the railroad reduced the value of the physical plant of the road and thus eroded the creditors' assets. The Note states that this practice was approved by the Supreme Court and argues that by so approving, the Court has substantially altered the meaning of the taking clause.

31. *See* Brooks-Scanlon Co. v. Railroad Comm., 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); Railroad Comm. of Texas v. Eastern Texas R. Co., 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924).

32. It may be noted that the ICC has adopted new procedures expediting the disposition of applications for abandonment of lines. *See* Commonwealth of Pennsylvania v. United States, 361 F.Supp. 208 (M.D.Pa. filed June 4, 1973).

33. Were the Trustees unsuccessful before the state agency, recourse could be had to the ICC pursuant to 49 U.S.C. § 13a(2).

The cases of Brooks-Scanlon Co. v. Railroad Comm.[34] and Railroad Comm. of Texas v. Eastern Texas R. Co.[35] make clear that a railroad may not be required to remain in business in the face of confiscatory losses. Both of these cases, however, dealt with attempts by each railroad to leave the railroad business entirely. In the present case, the Trustees do not seek to abandon all their railroad operations. Rather they ask to terminate only the passenger service. In contradistinction to the situation now before us, the earlier cases involve attempts by the unprofitable venture to renounce their state-granted franchise completely. Here, the Trustees would have the district court permit them to select those aspects of their state-granted privilege they choose to accept without allowing the state to impose any further burden on the exercise of the privilege.[36]

Further, these two cases do not decide whether in seeking to terminate a service, the Trustees may, with the approval of the district court, by-pass the state and federal administrative procedures.

In *Brooks-Scanlon*, the action underlying the case was an order of the Railroad Commission of Louisiana requiring a lumber company to operate its railroad on schedules approved by the Commission. With the Commission having already acted, and having mandated continuation of the confiscatory services, the Supreme Court held that the railroad need not formally petition the Commission for permission to terminate. The Court, through Justice Holmes, stated:

"[I]t seems unlikely that after the Commission has called the plaintiff before it on the question and against its strenuous objection has required it to go on, such an empty form cannot be required."[37]

With the position of the Commission being clear, the Supreme Court could then state,

"Whatever may be the forms required by the local law it cannot give the Court or Commission power to do what the Constitution of the United States forbids, which is what the order and the injunction attempt." [38]

In *Eastern Texas*, the railroad was attempting to abandon the intrastate service on the railroad. Interstate service had already been abandoned, after such abandonment had been approved by the ICC.[39]

The Trustees here, however, have not sought any administrative review whatsoever. Thus, there can be no clear statement that the agencies would require service continued as is, that they would attempt to impose confiscatory requirements, or that they would not grant suitable relief.

Palmer v. Massachusetts clearly states that administrative agencies may not be disregarded.

"Continuance of state control over these local passenger services will, it is urged, impair the bankruptcy court's power to formulate a reorganization plan for the approval of the Interstate Commerce Commission. Such embarrassments due either to the time required for exhaustion of the orderly state procedure or to the financial losses that may be involved in the continuance of local services until duly terminated by the state, may easily be exaggerated. It is not without signif-

34. 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920).

35. 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924).

36. *See* Fort Smith Traction Co. v. Bourland, 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631 (1925). *But see* Norfolk & Western Ry. Co. v. West Virginia, 236 U.S. 605, 35 S.Ct. 437, 59 L.Ed. 745 (1915). Under section 77(g), 11 U.S.C. § 205(g), the Trustees could ask that the proceedings be dismissed, thus, perhaps, resulting in the railroad's ultimate withdrawal from the railroad business.

37. 251 U.S. at 400, 40 S.Ct. at 184.

38. *Id.*

39. 264 U.S. at 83, 44 S.Ct. 247.

icance that after four years no reorganization plan for the New Haven has yet been evolved. Perhaps it is no less true that amenability to state laws will serve as incentive to the formulation of reorganization plans which, on approval by the Commission, do supplant state authority. But, in any event, against possible inconveniences due to observance of state law we must balance the feelings of local communities, the dislocation of their habits and the over-riding of expert state agencies by a single judge. . . ."[40]

Therefore, this Court holds that termination of passenger service cannot be ordered by the district court supervising the reorganization of a railroad under section 77, unless such termination has been approved by the appropriate agency.[41]

## V.

This Court's holding does not preclude district courts from permitting ailing railroads to terminate services. Rather, it holds only that the reorganization court require railroads seeking terminations to follow certain procedures. Adherence to such procedures is not an exercise in formalism. Rather, such adherence reflects two important concerns. First, application to the appropriate state agency preserves the balance between federal and state powers in this field. Second, administrative review assures that an agency with substantial expertise, be that agency state or federal, will provide that the appropriate amalgam of public concerns for rail transport and private rights of property is achieved.

Having reached this result, however, the Court must express its disquiet over the plight of the bondholders of this railroad, and the other railroads whose reorganizations are being conducted by courts of this Circuit. In many respects, it is their equity which is being used to sustain these railroads. Such a situation is most unfortunate. The dissenting opinion paints a most graphic and colorful picture of this serious condition. Yet, this Court may provide such bondholders and other creditors relief only within the confines of Section 77, the enactment which encompasses the procedure mandated by the Congress, and the Supreme Court opinions interpreting that statute.

Were this Court not a judicial body but a legislative body, it could fashion perhaps a more equitable system for financing vitally needed yet inherently unprofitable rail services. Indeed, the time is rapidly approaching when both federal and state legislative bodies must squarely meet that responsibility. Such is not our prescribed role, however, as enticing as such assignment might be. Instead, our task is to apply the statute Congress has enacted unless such statute inexorably conflicts with the Constitution. The record in this case does not demonstrate that such conflict has happened here—at least, not as yet.[42]

Therefore, the judgment of the district court will be reversed and the case remanded for proceedings consistent with this opinion.

## APPENDIX

*Statements by Trial Court Bearing on Question of "Taking"*

". . . unless some way is found to fully compensate the debtor for its passenger operations that such operations of

---

40. 308 U.S. at 89, 60 S.Ct. at 39.

41. This Court need not decide, at this time, whether such termination order should be granted if there appeared to the district court to be undue delay by the administrative agency.

42. There is set forth in the attached Appendix a series of statements by the distinguished and able trial judge who has supervised the reorganization, which illustrate that the point of a taking, in the sense of due process, has not yet been established in this proceeding so as to justify a deviation from the mandate of Section 77. The statements are contained in the district court's opinion on the Trustees' motion to cancel the passenger contract and on the petition of Manufacturers Hanover Trust Company to terminate all operations of the Central.

necessity must cease. Otherwise we *will* run into an erosion of assets that *will* result in an unconstitutional taking of the debtor's property." (Emphasis added)  429a

"CNJ asks this Court to terminate the present subsidy contract as of December 31, 1972, and at that time to terminate all passenger services of the debtor as of 11:59 p. m. on that date, *unless, prior thereto, suitable arrangements can be made with the State to continue the carriage of passengers.*" (Emphasis added)  431a

"Perhaps the parties should pay a little attention to the spirit behind that particular paragraph. Perhaps between now and the time the cancellation becomes effective the parties can get together to the end that perhaps this particular carrier can continue to operate both freight and passenger service in the State of New Jersey."  433a

"We cannot lose sight of the fact that some progress has been made and that conditions subsequent to March of 1971 have helped rather than hindered the estate, and consequently those who hold security interests in the estate."  439a

"We have had some changes here, and they are all changes that I think are very beneficial, and will be of benefit to the estate generally. And I have reference to a few of them that were mentioned here."  440a

"And I could go on with a few others. But you all heard what they are. But they are all indications, they are all activity, they all indicate that improvement is being made, that the condition of the railroad is not too bad, insofar as the bondholders' security is concerned."  442a

ALDISERT, Circuit Judge, with whom WEIS, Circuit Judge, joins (dissenting).

I would affirm the order of the district court and reaffirm the action of the panel which first considered this appeal.[1] I would hold that the reorganization court had jurisdiction to act and that its order did not constitute an abuse of discretion.

Because my approach differs substantially from that of the majority, it becomes necessary first to outline general contours of the crisis facing our nation's passenger rail carriers today. I deem such an understanding to be essential to the solution of the problem of this case.

I.

As a legal essay the majority opinion appears sound. And it would have been acceptable if written some three decades ago when the railroads whose passenger lines run through this judicial circuit were a viable segment of private industry; at a time when the emergency federal financial subsidy legislation and the New Jersey state commuter's support legislation were not yet on the statute books. But this is 1973, and I believe that a 1973 federal court should look at this 1973 New Jersey commuter railroad problem from a 1973 perspective. This perspective includes a recognition of five critical factors:

1. Although only 13 per cent of all railroad mileage belongs to bankrupt railroads, essentially all of this is located in the Northeast. Some 80 to 88 per cent of all railroad trackage in the three states of this judicial circuit is in the

---

1. Circuit Judge Maris and District Judge Gorbey, other members of the original panel, did not sit on the court en banc. Judge Maris was temporarily ill. District Judges are not authorized to sit on en banc rehearings in the courts of appeals.

process of financial reorganization.[2] Once this fact of 1973 life is recognized, it strains credulity to accept the majority's implication that the Interstate Commerce Commission, a government agency charged with the supervision of these railroads, has the capacity or capability of bringing about a "resurrection of railroads in reorganization." (Majority 213.) Putting aside a spiritual miracle, that resurrection can be brought about only by federal and state financial aid. Although the majority seem unwilling to recognize this, the Congress and the New Jersey legislature have.

2. The majority approach this case as if the Rail Passenger Service Act of 1970, 45 U.S.C. §§ 541–548 had never been enacted. That was a legislative declaration of national railroad policy proclaiming that inter-city passenger service would be forced to cease, unless federal financial assistance was forthcoming. Reasons cited for this crisis were competition from 90 million automobiles and multiple schedules of competitive jet air service which directly competed with passenger transportation.[3] The decline of railroad freight business also diminished the passenger carrying capabilities of the railroads. Traditional railroad freight business was lost to inland waterway operations, pipelines and trucks. Moreover, government policy tended "to favor non-rail transportation and perpetuate a regulatory climate that [was] hostile to experimentation." Water, air and highway transportation were successfully aided through public investment, at little or no user cost while railroads had to make such investments on their own.[4]

2. Without question we face a short-term rail crisis in the Northeast. Six of the rail carriers in this area are in bankruptcy, and the dominant one—the Penn Central—is on the verge of Court ordered liquidation in order to prevent further erosion of the creditors' estates. Correcting this short-term problem will require cooperative and public-spirited action by all parties involved—Congress, the Administration, regulators, labor, creditors, shippers, *and the courts.* (My emphasis.)
Department of Transportation (DOT) Report to Congress, Northeastern Railroad Problem, March 26, 1973, submitted by the Secretary of Transportation in response to S.J.Res. 59–2, Page 5.

3. Legislative History, House Report No. 71–1580. U.S.Code Cong. & Admin.News, p. 4735 (1970).

4. Staff Report, "The Penn Central and Other Railroads," Senate Committee on Commerce, December 1972, at 220–222:
. . . In 1929 the railroads were the country's dominant form of commercial transportation, hauling most of the freight and moving most of the people traveling by public means between cities. Reflecting their preeminent transport role the railroads were generally in sound financial health, with their earnings making their debt and equity securities widely respected forms of investment.
By 1970 . . . the posture of the railroads was radically different. Moving only a little more than 40 per cent of the nation's intercity freight and only a tiny fraction of intercity passengers, the railroads were no longer the primary form of transportation in the United States
. . . .

.    .    .    .    .

.    .    .    .    .

. . . The mining/forestry/agricultural sectors, which have long been the primary generators of rail freight traffic, have declined in relative importance, with their rates of growth generally lagging behind the overall rate of economic expansion. Faster rates of growth have come in manufacturing, but the railroads have been unable to adjust their service to attract this traffic (and revenue) needed to offset the relative losses sustained due to the slower growth in the low-value bulk-goods sectors.
Meanwhile, other modes of transportation—in part because of their technological advances, in part because of the provision of government infrastructure—have provided increasingly tough competition for the railroads. The inland waterway operators and the pipelines have diverted some bulk traffic and the trucks have taken a large share of higher-valued manufactured goods traffic. Pinched from both sides, the railroads' position has been weakened, with the greatest harm coming in the manufactured goods area since here the rates of growth in output (and thus in traffic) have been the fastest (and promise to be so in the future) and the yields are the most substantial. Here also,

For three years Amtrak has been operating inter-city lines, with federal financial assistance by use of outright grants, 45 U.S.C. § 601; guarantee of loans, 45 U.S.C. § 602; and emergency financial assistance, 45 U.S.C. § 621.[5] Actual federal appropriations to Amtrak to date have been $210,000,000 in grants and $100,000,000 in guaranteed loans.

But Congress was careful to distinguish between inter-city passenger lines, which come under federal financial support, and commuter lines—the passenger service involved in this appeal—which come under state supervision.

3. Passenger service on intrastate commuter lines traditionally has not been subject to federal regulation.

---

though, competition is intense because service factors (speed, schedule reliability, etc.) are substantial, often even more so than tariffs . . . .

. . . . .

On the regulatory side existing government controls, at the State as well as the Federal level, continue to be more oriented to the protection of the transport status quo than to the creation of an environment favorable to change . . . . Such approaches require a sympathetic climate, one that reacts promptly to proposals and that reflects a willingness to permit experimentation. Existing regulation is almost a contradiction of these essential features. It is slow, cumbersome, passive, and protective—qualities that reflect deeply ingrained legal standards, cumulative regulatory attitudes, and a status quo outlook that permeates the entire transport environment.

The views of the Senate staff committee are echoed by the Department of Transportation:

From a meager start in about 1830, the Nation's rail industry moved ahead rapidly following the Civil War. The decade of greatest expansion in railway trackage was the 1880's. By 1890, nearly two-thirds of our railway mileage was in place. Railway mileage peaked in 1916 when there were 254,000 miles of railway in the United States.

As the industry matured, its overall growth rate slowed drastically and in the Northeast it has actually declined since 1947. The root of the decline lies in the railroads' changing economic and regulatory environment and the industry's inability to adapt adequately to the changes.

As strong intermodal competition developed, the railroads' intercity freight and passenger markets suffered. Coal's losses to oil, which is transported primarily by pipeline, was another blow to the railroads. Northeastern railroads in particular were hard hit after World War II by the losses to the South and West of industries dependent on heavy freight movements. The diminishing importance of the agricultural, forestry and mining industries in the Northeast, and the shift to a post-industrial service type economy, also hurt.

. . .

One of the most important developments affecting the railroads, particularly in the Northeast, was the growth of the intercity trucking and barge industries. Before the advent of large, efficient trucks, the rails had put down thousands of miles of line and were serving virtually every economically important sector of the Northeast. But an exhaustive network of modern highways built in recent years has tied the big cities together and enabled the motor carriers to capture most of the short haul and medium hall non-bulk commodity traffic from the rails.

At the same time, motor carrier competition, with its constant threat of diverting traffic, has helped to place a ceiling on rail rates. Thus, even though the amount of freight traffic carried by the railroads has expanded as the economy has expanded, the average rail revenue per ton-mile in 1970 was two percent less than in 1958. Although the introduction of piggyback service and tri-level auto cars in the late 1950's allowed the railroads to recover or retain some medium haul traffic, it was not enough to enable them to hold their own against the trucks.

Railroads have also suffered in recent years from government policies which have favored non-rail modes. This has permitted these modes to improve their productivity and quality of service. In addition, many state and local governments have taxed railroads at a higher rate than other industries, and rails currently pay a higher proportion of their gross revenues in taxes than do motor carriers.

DOT Northeastern Report, note 2, *supra*, at 9–11.

5. Section 601 authorizes an appropriation of $40,000,000 for 1971, and $225,000,000 for

Commuter service generally is regulated by the state public utility commission. The commuter service in this appeal is no exception.

4. Amtrak federal financial aid which is available to inter-city lines, not being available to commuter lines, it became incumbent upon the states to support beleagured commuter lines much in the same manner that the federal government came to the support of the inter-city lines. "[Amtrak] will undertake the responsibility for providing the rail passenger service of the future, and it will be free to go beyond the original basic system, particularly *where State, regional, or local authorities are willing to provide financial assistance for service which they desire*." [6] The same factors described in 2 which caused the problems in inter-city lines caused the financial crunch in commuter lines. Thus, New Jersey enacted legislation to subsidize continued rail commuter services. 27 N.J.S.A. 1A–18 (1973 Supp.). For 1973 New Jersey's total commuter subsidy amounts to $14,948,913, of which the CNJ subsidy amounts to $5,115,101.[7]

5. The New Jersey subsidy thus far has been based on an "avoidable loss" figure computed by determining whether a particular cost would be avoided if passenger service were discontinued. The New Jersey legislature "[i]n order to conserve and improve passenger service necessary for public use . . . in this State," authorized the payment "of the full cost of such passenger service. . . ." Section 18 of P.L.1966, c. 301 (C. 27:1A–18) effective July 18, 1972. Significantly, the introductory statement to this legislation declares:

This bill changes the present law to allow the commuter operating agency

to compensate carriers for rail passenger service up to the full cost of providing such service rather than on the present avoidable loss basis. It also authorizes payment on a current basis rather than on a reimbursement basis. These changes are necessitated by recent Federal court rulings in connection with the reorganization of the Pennsylvania Central Railroad. It is likely that the full cost of service basis will become the standard required by the courts as a prerequisite for allowing railroads in the process of a reorganization to continue to provide passenger service.

## II.

I now turn to the litigation at hand. This case is purely and simply a push and pull squabble between the Trustee of CNJ and the State of New Jersey over the amount of the commuter subsidy. The railroad needs more commuter subsidy from the state. The state is only paying "avoidable loss" subsidies, although the legislature has authorized payment of the "full cost." The technical roadblocks thrown up by the State to avoid paying its responsibility now—the insistence of a prior resort to state or federal administrative agencies—were cast aside by Judge Augelli in the district court. He ordered the parties to come to an agreement or else he would order abandonment. When New Jersey failed to implement its statutory authority, the court issued the order. The original panel of this court affirmed. On rehearing the majority have now replaced the roadblocks so that New Jersey can get a free ride during the useless, futile and excruciatingly delayed administrative proceeding at the expense of the bondholders and mortgagees

subsequent years. Under § 602 loans may be guaranteed up to $150,000,000 before July 1, 1973, and up to $200,000,000 thereafter. Emergency loans and guarantees may aggregate $200,000,000 under § 621.

6. Legislative History, *supra*, note 3, at 4737.

7. For fiscal 1972–1973 Pennsylvania's commuter subsidies included:

| | |
|---|---|
| Penn Central | $4,872,350 |
| Reading | 4,333,333 |
| SEPTA administrative expenses | 300,000 |

Pennsylvania has not contributed one cent to commuter support for CNJ.

whose property is now being taken, in my view, without due process of law.

An example of the delay envisioned by the majority's action was expressed by a Commonwealth of Pennsylvania brief in another appeal in this court.[8] Asking this court to order resumption of service on Penn Central trackage which had been permanently damaged by Hurricane Agnes, the Commonwealth of Pennsylvania asked this court *not to wait* until ICC determination: "The final I.C.C. decision—and judicial review thereof—are several years distant." As recent as March 26, 1973, the Department of Transportation (DOT) complained to Congress about the delay inherent in abandonment proceedings associated with the "Northeastern Railroad Problem":

> Federal and state regulatory policies have made it difficult for the railroads to adapt to changing economic and competitive conditions. The Interstate Commerce Act seems especially in need of modification and incorporation of regulatory relief in the following areas.
>
> 1. *Abandonment*
>
> Lengthy procedures often prevent or unnecessarily hinder a railroad's efforts to abandon branch or other lines that can no longer cover even variable costs. Hearings, briefs, rebuttals, and

other procedures may delay abandonments for years—all the while forcing the railroad to provide the service at a loss . . . .[9]

### III.

Whatever disagreement there may be on the specifics of reorganizing railroads, one thing appears clear: "Current public policy is deficient. Government action will be required in a variety of efforts so that the industry is better able to respond to changing circumstances. The present structure and organization of the private sector along with the public policy too often fail to meet public needs for rail transportation."[10]

Significantly, the Department of Transportation reported to Congress on March 13, 1973, a recommendation for a federal grant of $93,000,000 for Amtrak to underwrite operating losses for fiscal 1974, an increase in loan guarantees, open-ended authorization not to exceed $500,000,000. "It is the judgment of both Amtrak and DOT that, at this time, other than federal grants and loan guarantees there is no source from which Amtrak can fund its operating losses and meet its capital requirements. Given the losses in FY 1972 and FY 1973 Amtrak is not in a position to issue

---

8. Commonwealth of Pennsylvania v. Baker, 475 F.2d 1394 (3d Cir., 1973) (Commonwealth brief, 13).

9. DOT Northeastern Report, *supra*, note 2, at 22.

In a more comprehensive report, on the Rail Passenger Service Act (Amtrak) dated March 15, 1973, DOT explained:

In the case of a train operating wholly within a single state, Amtrak must seek permission to discontinue from an appropriate state authority before seeking permission to discontinue from the ICC. In such a case, the findings which the ICC must make in order to authorize discontin-·uance are slightly different and, while pendency of the state proceeding may not bar Amtrak from seeking authority to discontinue from the ICC for more than 120 days, there is no time limit placed on the ICC's power to delay the discontinuance.

Indeed, there can be no discontinuance in a case of this type until the ICC has authorized it.

Decisions of the Commission under Section 13a are reviewable by a three-judge District Court pursuant to Sections 1336, 1398, 2321–2325 and 2284 of the Judicial Code (28 U.S.C.). Decisions of a three-judge District Court are reviewable by appeal in the Supreme Court pursuant to 28 U.S.C. Section 1253. This review process can add as much as two or three years to the period of time during which Amtrak must continue to provide an uneconomic low patronized service.

Recommendation: The discontinuance procedure should be changed to avoid continuing uneconomic service, through an extended period of litigation.

DOT Amtrak Report, 104–105.

10. Staff Report, *supra*, note 4, at 189.

stock or incur debt without Federal guarantees." [11]

Similarly, the New Jersey Department of Transportation, in a statement implementing its "plans for the preservation and improvement of the commuter railroad system" reported the following expenditures: [12]

*Operating Assistance*

| Railroads | Contract Amt. Fiscal 1973 | Contract Amt. Fiscal 1961–72 |
|---|---|---|
| Penn Central | $ 51,600 | $ 9,847,642 |
| Erie Lackawanna | 9,106,000 | 44,843,260 |
| Central Railroad | 5,115,101 | 42,290,774 |
| Penn-Reading S.L. | 676,212 | 2,471,798 |
| Totals | $14,948,913 | $99,453,474 |

Hopelessly dependent upon such current massive aid from federal and state sources, 1973 railroad problems cannot be considered in the context of conditions 40 years ago. [13] I cannot read Supreme Court decisions relating to this phase of railroading in 1939 as being viable in 1973. I cannot read Section 77(*o*) of the Bankruptcy Act, 11 U.S.C. § 205, with the strictures arbitrarily imposed by the majority. The rationale of Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939), was articulated in an era when American passenger railroads were a part of the private sector of American industry, and not dependent for survival on massive infusion of federal monies for inter-city lines and state monies for commuter lines. [14] I also recognize that insofar as ICC jurisdiction is concerned, DOT has announced that "Amtrak, under its Congressional charter, differs substantially from the individual rail carriers which provided service prior to May 1, 1971." [15] DOT has recommended elimination of ICC review of discontinuances of service required by the basic system and clarification of the lack of jurisdiction over other aspects of Amtrak operations. [16] The

11. Staff Report, *supra*, note 4, at 100.

12. Pamphlet, The New Jersey Department of Transportation, "What it is . . . what it does," 1973.

13. "In 1929, there were some 20,000 passenger trains in the United States. Nine thousand of these had disappeared by 1946. Here in 1970 there are less than 500 and over 100 of these are presently in the process of discontinuance proceedings before the Interstate Commerce Commission. Many of the existing passenger trains are operating under heavy and continuing deficits. The committee regretfully recognizes that a large number of them hold no promise for financial success in the foreseeable future." Legislative History, *supra*, at 4736–4737.

14. DOT has reported to Congress:

The industry's history is rife with bankruptcies. As one would expect, the largest number of them resulted from the Great Depression when at one point in the 1930's, 33 percent of all railroad miles were in receivership. At the present time, 13 percent of all railroad mileage operated belongs to bankrupt railroads— essentially all located in the Northeast. *However, the two situations are different in that the bankrupt railroads in the 1930's still had some earnings around which they could, and in fact did, reorganize.* Today the outlook is less favorable.

(Emphasis supplied.) DOT, Northeastern Report, *supra*, note 2, at 11.

15. DOT Amtrak Report, *supra*, note 9, at 107.

16. DOT Amtrak Report, *supra*, note 9, at 7, 107–09.

Additionally, DOT as found:

Unlike other bankrupt industries, bankrupt railroads have not been allowed to reorganize and modernize their operations. Plant and equipment is not dismantled, nor the land and other properties sold, the way other businesses that go through bankruptcy are liquidated. Despite the large number of miles of road in receivership, only an average 0.4 percent of the total road mileage has been abandoned annually since 1916, the peak year. Rail bankruptcies have not been treated as a sign that the industry had fundamental problems (such as over-capacity in a nongrowth industry) which needed correction. Nor have they been used as an opportunity to help correct the problems by allowing some of the bankrupt roads, or perhaps major parts of them, to go out of existence. Instead, railroads were deemed too important to the economy to be discarded. It was felt that the companies could be made viable simply by reducing their debt structure or merging them with healthier roads. This patchwork policy

staff report to the Senate Committee on Commerce speaks to "changes in approach" of section 77. "Attention should be given to overhauling the Act so that it provides sufficient authority for addressing transportation problems as well as financial problems." [17] And it seems to me that the very same reasons why "Amtrak . . . differs substantially from the individual rail carriers which provided service prior to May 1, 1971," apply with equal vigor to CNJ. Amtrak is dependent upon federal financing; CNJ, upon New Jersey financing. This governmental financing, so essential to modern railroad survival, constitutes the critical difference. Therefore, CNJ can be said to differ "substantially" from the pre-1971 carriers; and because of this difference the factors which controlled *Palmer* in 1939 are not applicable here in 1973.

## IV.

CNJ has been in reorganization pursuant to Section 77 of the Bankruptcy Act since March 22, 1967. The financial difficulties of this Railroad, however, long antedate the current reorganization. The CNJ has been operating with substantial annual deficits since 1958. The table in the margin lists those deficits.[18] The deficit for the first ten months of 1972 approximated $8 million.

CNJ's trustee tells us:

There is no dispute between the parties about CNJ's history of deficits; and, indeed, the State of New Jersey apparently believes CNJ to be in a more perilous financial position than does the Trustee. Subsequent to the hearing, on December 29, 1972, the New Jersey Department of Transportation issued a report on "The Jersey Central Situation" which contained the following statement:

Complete collapse of the Central Railroad of New Jersey as an independent carrier with resultant disruption of its rail operations, both freight and passenger, appears to be inevitable without massively increasing public financial support.[19]

The Administration has pointed out in three successive Economic Reports to the Congress (1970, 1971, 1972) that economic and competitive conditions have changed considerably since regulation began in 1887, and that changes have not been adequately reflected in the regulations governing surface freight transportation. The Department of Transportation believes that regulatory reform is fundamental to any plan to restructure the railroads of the Northeast.

(Emphasis supplied.) DOT Northeastern Report, *supra*, footnote 2, at 11–13.

has maintained essentially the same railroad network which was in place in 1920, *one which was geared to the environment and economy of the late 19th and early 20th century.*

The gradual broadening of the Interstate Commerce Act to increase regulatory controls has had a similar restrictive impact on the railroads. The continuing decline of the railroads as an industry, the financial plight of the railroads in the Northeast, and the inflexibility of response to competitive conditions in the marketplace have, in part, been brought about by the regulatory restrictions of the Interstate Commerce Act.

Regulatory practices have adversely affected railroads in many ways. They have permitted, even encouraged, abuses of "value of service" pricing and freight car utilization in ways that have led to a serious misallocation of transportation resources. Probably more important, regulatory practices have produced a rigid pricing structure which, for rails in particular, has prevented them from responding to the needs of a changing market. *In addition, outmoded regulations have impeded efficiency within a given mode by restricting competition and by discouraging the abandonment of uneconomic branch lines.*

17. Staff Report, *supra*, note 4, at 189.

18. 
| 1958— | $ 2,010,269 |
|---|---|
| 1959— | 2,872,258 |
| 1960— | 4,186,307 |
| 1961— | 7,141,924 |
| 1962— | 7,410,306 |
| 1963— | 6,098,233 |
| 1964— | 8,254,389 |
| 1965— | 6,665,192 |
| 1966— | 7,451,052 |
| 1967— | 13,616,041 |
| 1968— | 7,951,641 |
| 1969— | 9,381,372 |
| 1970— | 14,848,200 |
| 1971— | 7,695,058 |

19. Appellee's brief, 4.

The reorganization court found that it was imperative for a new subsidy contract to be negotiated between CNJ and New Jersey. The court found that if the present New Jersey subsidy contract with CNJ were to continue, the railroad will continue to lose $500,000 per month. The court found such losses to be "an erosion of assets that will result in an unconstitutional taking of the debtor's property."[20] If this is a finding of fact, I do not find it clearly erroneous; if a conclusion of law, I do not disagree with it.

## V.

The doctrine of *Palmer*, relied on by the majority, simply cannot apply to a railroad described by the ICC as being *"in extremis,"* where the railroad no longer survives as part of the private sector, but is completely dependent upon a state commuter subsidy program in which New Jersey has had to furnish 99 million dollars from 1961 through 1972. The issue comes down to this: given the perilous erosion of assets of a state supported railroad, and a state legislative policy commanding "actual cost support," is a reorganization court without power to order abandonment of service where the state refuses to enter into a subsidy contract other than "avoidable loss" when the state's refusal is causing the railroad to lose $500,000 a month?

The district court has that power under § 77(a), 11 U.S.C. 205(a):

> [T]he court . . . shall have and may exercise in addition to the powers conferred by this section, which a court of the United States would have had if it had appointed a receiver in equity of the property of the debtor for any purpose.

The majority relies on a strict construction of 77(*o*) which seems to require as a prerequisite to abandonment "the approval and authorization of the [ICC] Commission." I have heretofore observed that the strictures of this section have been considerably diluted by the change in the American economics and the railroad's role therein and the specific circumstances of this railroad, which may no longer be considered governmentally regulated private industry, which 77(*o*) was designed to serve. It is a copartner with the state of New Jersey in a quasi-private, quasi-governmental enterprise. And it is providing passenger commuter service only because the State of New Jersey insists upon it.

There is sufficient evidence of a national railroad policy enunciated in the Rail Passenger Service Act of 1970 and sufficient evidence of a state railroad policy in the New Jersey commuter operating agency legislation to persuade me that this policy dictates that the state or federal agency must provide adequate subsidy of passenger services or the carrier may terminate those services. This policy makes application of § 77(*o*) to a situation such as that of CNJ unnecessary. Section 77(*o*) envisions some discretionary action on the part of the ICC or state commission on the basis of public convenience and necessity.

## VI.

This leads inexorably to the fatal defect in the majority's approach: its insistence that there be exhaustion of statutory administrative remedies either to the ICC or the PUC before there may be judicial relief. In the face of a constitutional claim of confiscation, because of the constantly eroding assets, calculated at $500,000 a month, acknowledging that resort to administrative proceedings is an elaborate, time-consuming process, possibly taking years (*ante*, pages 10 and 11, n. 9), a requirement of initial resort to an administrative agency must have some purpose; some reason for the exercise of administrative discretion by reason of agency expertise. Laid bare, the heart of the problem is to ascertain what discretion still abides under the moribund financial circumstances confronting CNJ.

20. Appendix, 429a.

The ICC itself has conceded the necessity for some "drastic remedial action" in a proceeding entailing abandonment of certain CNJ lines in Pennsylvania:

> The overriding factor with which we are faced, is that since 1967, CNJ has been debtor in reorganization under the Bankruptcy Act before the United States District Court for the District of New Jersey. Its position has continuously deteriorated, as have other railroads serving the New York metropolitan area. CNJ now may be considered *in extremis*. During and since 1970, its losses have amounted to more than $1 million per month. Under the circumstances, some form of drastic remedial action became imperative.[21]

The dire financial condition of CNJ is not controverted by the State of New Jersey. The state has offered no suggestion by brief, nor at either of the two oral arguments of this case that the ICC or the PUC has the ability to fashion any relief other than that specifically ordered by Judge Augelli: increase the state subsidy or abandon the service.

Why then, the stubborn demand for an exercise in futility? What principle of current law has ever justified this? The philosophy condemned by Roscoe Pound as mechanical jurisprudence would have justified blind application of *Palmer* to this case: "Legal systems have their periods in which science degenerates, in which system decays into technicality, in which a scientific jurisprudence becomes a mechanical jurisprudence."[22] The effect of *Palmer's* application to these circumstances would be in Pound's words "petrifaction of the subject systematized . . . [that] tends to cut off individual initiative in the future, to stifle independent consideration of new problems and of new phase of old problems, and to impose the ideas of one generation upon another."[23]

But the warning of Pound has been heeded. Modern jurisprudential teachings have accepted Pound's adoption of Ihering's thesis: "[T]he first question should be, how will a rule or decision operate in practice?"[24] Obviously, I have deep misgivings about the result reached by the majority. At the same time, I am quick to recognize that it is for the court to interpret law, and not to legislate. "Legislation is enacted to regulate the social and legal environment of a living society. [But, as] Gény points out, to apply it to unforeseen or substantially changed conditions of other times, even though the original statutory purpose is no longer served, is to apply mechanically an abstract formula which no longer represents the will of the legislature . . . . In essence, then, the words of legislation contain a principle of regulation intended by the legislators to apply to contemplated norms of their own and succeeding times. But if there is a substantial change in the social [and economic] condition the statute is designed to regulate, the mechanical adjudication by reference to the statute's literal wording alone may, under the changed conditions, amount to an irresponsible application of a legal rule devised neither by legislative intent nor by the deciding court."[25]

Roger Traynor tells us:

> The responsibility to keep the law straight is a high one. It should not be reduced to the mean task of keeping it straight and narrow. We should not be misled by the cliché that policy is a matter for the legislature and not for the courts. There is always an area not covered by legisla-

---

21. ICC Conclusions at 288, cited In the Matter of Central Railroad Company of New Jersey, Debtor, Pennsylvania, Appellant, 486 F.2d 1124, 1126 fn. 3 (3d Cir., No. 73–1110, filed Sept. 20, 1973).

22. Pound, Mechanical Jurisprudence, 8 Col. L.Rev. 605–607 (1908).

23. Pound, *supra*, at 606.

24. Pound, *supra*, at 610.

25. Tate, The Law-Making Function of the Judge, 28 La.L.Rev. 211, 228 (1968).

tion in which the courts must revise old rules or formulate new ones, and in that process policy is often an appropriate and even a basic consideration.[26]

Both the Department of Transportation and the Senate staff to the Committee on Commerce have graphically delineated the fundamental changes in railroad industry which have occurred essentially since World War II in this nation and have especially affected the Northeast. (*Ante*, note 4). This critical data, plus the enactment of the new national railroad passenger policy by Congress in 1970 and the new New Jersey legislative policy as reflected by the state commuter agency persuade me that the strictures of 77(*o*) as interpreted by *Palmer* do not apply to the circumstances of this case.

In sum, what divides this court is what Justice Walter V. Schaefer, Illinois Supreme Court, has described as a difference in "the judge's unspoken notion as to the function of his court. If he views the role of the court as a passive one, he will be willing to delegate the responsibility for change, and he will not greatly care whether the delegated authority is exercised or not. If he views the court as an instrument of society designed to reflect in its decisions the morality of the community, he will be more likely to look precedent in the teeth and to measure it against the ideals and the aspirations of his time." [27]

We can agree that resort to an administrative agency is not mandated "[w]hen there is nothing to be gained from the exhaustion of administrative remedies and the harm from the continued existence of the administrative ruling is great." Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 825 (2d Cir. 1967). "[T]he exhaustion requirement contemplates an efficacious administrative remedy, and does not obtain when it would come to no more than an exercise in futility." Lodge 1858, American Federation of Government Employees v. Paine, 141 U.S.App. D.C. 152, 436 F.2d 882, 896 (1970). "The requirement that a plaintiff exhaust administrative remedies before applying for judicial relief presupposes that the remedy is an effective one." Northeastern Pennsylvania Nat'l Bank and Trust Co. v. Sandvick Steel, Inc., 325 F.Supp. 651, 655 (M.D.Pa.1971). *See also*, McKart v. United States, 395 U.S. 185, 199, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1968); 3 K. Davis, Administrative Law § 20.07 (1958) at 97. "Whether to require exhaustion is discretionary. If pursuing an administrative remedy would be futile, the requirement may be waived. City Bank Farmers Trust Co. v. Schnader, 291 U.S. 24, 34, 54 S.Ct. 259, 78 L.Ed. 628 (1934); *see* 3 Davis, Administrative Law Treatise, § 20.07, at 99 (1958)." United States ex rel. Marrero v. Warden, Lewisburg Penitentiary, 483 F.2d 656, at page 659 (3d Cir., 1973).

### VII.

Thus it comes to this. Theoretically, the administrative agencies have discretionary authority to approve or disapprove the request for abandonment. Actually and realistically their discretion is non-existent, because of the *in extremis* condition of CNJ. "To compel it to go on at a loss . . . would be to take its property without the just compensation which is a part of due process of law. The controlling principle is the same that is applied in the many cases in which the constitutionality of a rate is held to depend on whether it yields a fair return." Railroad Commission of Texas v. Eastern Texas Railroad Company, 264 U.S. 79, 85, 44 S.Ct. 247, 249, 68 L.Ed. 569 (1923).[28]

---

26. Traynor, Some Open Questions on the Work of State Appellate Courts, 24 U. of Chicago L.Rev. 211, 219 (1957).

27. Schaefer, Precedent and Policy, 34 Univ. of Chi.L.Rev. 3, 23 (1966).

28. Citing Brooks-Scanlon Co. v. Railroad Commission of Louisiana, 251 U.S. 396, 399, 40 S.Ct. 183, 64 L.Ed. 323; Bullock v. Railroad Commission of Florida, 254 U.S. 513, 520, 41 S.Ct. 193, 65 L.Ed. 380; State ex rel. Cunningham v. Jack, 113 F. 823; s. c.

The statutory purpose of 77(*o*) cannot be applied to a situation where resort to an administrative body is a hopeless, useless gesture which exalts form over substance. This is my interpretation of 77(*o*), albeit one that does not rest on the literal wording of the statute. But there is recent precedent for a non-literal interpretation of Section 77(*o*). Recently this court, also speaking through Judge Adams, has interpreted Section 77(*o*) to mean that the trustees of Penn Central had no authority to sell real estate, even though approved by the reorganization court, notwithstanding the explicit language of that section sanctioning the sale. Judge Adams emphasized that "the Court had had to grapple with the problem presented here wherein a section of a statute states a proposition that if read *in vacuo* would appear incompatible with the congressional directive manifested by the entire statute." [29] I suggest that the same considerations which influenced the court to depart from an *in vacuo* approach in Penn Central should be applicable here. I do not believe this court should be a strict constructionist with CNJ and a free spirit constructionist interpreting the *very same section, 77(o)* in Penn Central. As the court examined the Congressional policy there, it should have with equal vigor examined the overall national and New Jersey railroad policy of 1973.

Indeed, I believe my interpretation is the only one which, under these circumstances, will preserve the constitutionality of 77(*o*). If the majority's interpretation of 77(*o*) is correct, then the statute is per force unconstitutional as to the 3¼% Mortgage Bondholders' Protective Committee and the Manufacturer Hanover Trust Company, indenture trustee of the CNJ's only general mortgage bond issue. Given the finding of a monthly loss of $500,000, from this operation, the overall monthly loss of the CNJ of $1,000,000 as found by the ICC, emphasizing the admission by New Jersey that "complete collapse of the Central Railroad of New Jersey as an independent carrier with resultant disruption of its rail operations, both freight and passenger, appears to be inevitable without massively increasing public financial support," considering the new national and state railroad policy, and recognizing that any resort to the PUC or the ICC would be a useless act, knowing that the only viable alternatives are (1) more subsidies from New Jersey, or (2) an abandonment of services, the interpretation of 77(*o*) as articulated by the majority makes that statute unconstitutional in that it deprives the bondholders and the mortgagee of due process of law because it confiscates their property.

The majority state that our task is to apply the statute until it "inexorably conflicts with the Constitution" and that "such conflict has [not] happened here —at least, not as yet." My disagreement with the majority is that I believe that the conflict is now at hand.[30] The

145 Fed. 281; Iowa v. Old Colony Trust Co., 215 F. 307, 312 (8 Cir.); Northern Pacific R. R. Co. v. Dustin, 142 U.S. 492, 499, 12 S.Ct. 283, 35 L.Ed. 1092; Commonwealth v. Fitchburg R. R. Co., 12 Gray 180, 190; State v. Dodge City, etc., Ry. Co., 53 Kan. 329, 336, 36 P. 755.

29. In Matter of Penn Central Transportation Co. (Morgan Guaranty Trust, Appellant), 484 F.2d 323, 336 (3d Cir., Nos. 72–2116/26, filed June 14, 1973).

30. The majority devote sixteen pages of an extremely erudite opinion setting forth reasons why strictures of Section 77 as interpreted by Palmer v. Massachusetts make it

impossible for any court to afford relief even in the presence of an unconstitutional taking of property. Suddenly, in the penultimate paragraph, an entirely new theory is advanced, augmented by footnote 42, stating that "the point of taking, in the sense of due process, has not yet been established so as to justify a deviation from the mandate of Section 77."

A fair reading of this footnote suggests that the majority have now embraced the conceptual underpinnings of this separate dissenting opinion. They seem to say that an affirmance of the reorganization court is not appropriate because, although it was an action taken to prevent an unconstitutional

majority have expressed an idea whose time has come.

I would affirm the order of the district court.

taking of the bondholder's and mortgagee's property, the order was premature because the precise moment of unconstitutional taking had not yet arrived.

Supporting this interesting concept is a compilation of excerpts of bench comments which emphasize *per verba de futuro*. Thus, what apparently divides this appellate court is the emphasis to be placed on grammatical tense utilized by the reorganization court in certain oral statements: had that court used *per verba de praesenti* another result would be mandated. Stated as a legal principle, this suggests that (1) the reorganization court is powerless to prevent an unconstitutional taking, and (2) it can act to prevent a confiscation only after the confiscation has

taken place. My difficulty in accepting such a notion is manifest.

I think this is too serious a matter to exalt form over substance. Under the supervision of federal courts—from 1967 through the first eight months of 1972 (as limited by this case record)—CNJ has lost sixty-two million dollars. The ICC reports: "CNJ now may be considered *in extremis*. During and since 1970 its losses have amounted to more than $1 million per month." (*Ante,* page 224.)

These brute statistics are chilling. They cry out for action; not for an exercise in logomachy.

