In the Matter of ERIE LACKAWAN-NA RAILWAY CO., Debtor.

Appeal of SOLON, AURORA, MANTUA AND YOUNGSTOWN and the Commuters who regularly ride Train No. 28 and No. 29,

Interstate Commerce Commission, Amicus Curiae.

Appeal of RAILWAY LABOR EXECUTIVE ASSOCIATION.

Appeal of PUBLIC UTILITIES COMMISSION OF OHIO.

Appeal of UNITED STATES of America.

Nos. 74–1192 to 74–1195.

United States Court of Appeals, Sixth Circuit.

May 6, 1975.

Loyal V. Buescher, Charles T. Riehl, Walter, Haverfield, Buescher & Chockley, Cleveland, Ohio, for Solon, Aurora, Mantua and Youngstown.

Wallace R. Steffen, Cleveland, Ohio, for Trustees.

Clarence M. Mulholland, Richard R. Lyman, Mulholland, Hickey & Lyman, Toledo, Ohio, Edward J. Hickey, Jr., William J. Hickey, Geoffrey N. Zeh, Washington, D. C., for Railway Labor Executive Assn.

William J. Brown, Atty. Gen. of Ohio, Columbus, Ohio, Keith F. Henley, Cheryl H. Keith, Columbus, Ohio, Marvin I. Resnik, Columbus, Ohio, for Public Utilities Commission of Ohio.

Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, Carla A. Hills, Stephen F. Eiperin, David Anderson, James F. Dausch, Attys., U. S. Dept. of Justice, Washington, D. C., for United States.

Before McCREE, LIVELY and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

This is an appeal from Order No. 169 of the United States District Court for the Northern District of Ohio, sitting as a reorganization court under Section 77

of the Bankruptcy Act, 11 U.S.C. § 205. That order authorized the Trustees of the Erie Lackawanna Railway Company to discontinue the railway's commuter trains 28 and 29, which run between Youngstown and Cleveland, Ohio, a distance of approximately 66 miles.

■ Appellants, the United States, the Public Utilities Commission of Ohio, the Railway Labor Executives Association and certain municipalities affected by the ordered discontinuance, challenge the district court's power to authorize the discontinuance of commuter service where the Trustees have not first obtained authorization from either the Public Utilities Commission, or the Interstate Commerce Commission pursuant to Section 13a(2) of the Interstate Commerce Act, 49 U.S.C. § 13a(2).[1] We agree with the Third Circuit in *In the Matter of Central Railroad Company of New Jersey*, 485 F.2d 208 (3rd Cir. 1973), *cert. denied*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974), that *Palmer* v. *Massachusetts*, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939) is still controlling authority and that the district court was without power to enter the order appealed from.

Erie Lackawanna Railway Company has been in reorganization under Section 77 of the Bankruptcy Act since June 26, 1972. On January 12, 1973 the Trustees moved the reorganization court for authority to apply to the Public Utilities Commission of Ohio (PUCO) for the discontinuance of commuter trains 28 and 29 which the railway was then operating daily except for Saturdays, Sundays and holidays between Youngstown and Cleveland, Ohio. According to affidavits filed with the motion, the annual operating expense of the two trains was $243,500, but generated only about $90,000 in gross revenues. The affidavits detailed efforts of the railway to operate the trains efficiently and to make them attractive to the traveling public, notwithstanding which the average revenue occupancy on the basis of available seat-miles was only 17.7% to 20% per trip. In consequence, the Trustees urged, "the continued operation of the trains will result in a diminution of the working capital and assets of the Debtor, and there is no justification for the creditors of the railroad to subsidize the cost of transportation of the commuters who used the trains".

Two days after obtaining the district court's consent, the Trustees, on January 19, 1973, filed an application with the PUCO to abandon the operation of the two trains as provided for in section

---

1. That section provides:

49 U.S.C. § 13a(2)

Section 13a(2). Where the discontinuance or change in whole or in part, by a carrier or carriers subject to this chapter, of the operation of service of any train or ferry operated wholly within the boundaries of a single State is prohibited by the constitution or statutes of any State or where the State authority having jurisdiction thereof shall have denied an application or petition duly filed with it by said carrier or carriers for authority to discontinue or change, in whole or in part, the operation or service of any such train or ferry or shall not have acted finally on such an application or petition within one hundred and twenty days from the presentation thereof, such carrier or carriers may petition the Commission for authority to effect such discontinuance or change. The Commission may grant such authority only after full hearing and upon findings by it that (a) the present or future public convenience and necessity permit of such discontinuance or change, in whole or in part, of the operation or service of such train or ferry, and (b) the continued operation or service of such train or ferry without discontinuance or change, in whole or in part, will constitute an unjust and undue burden upon the interstate operations of such carrier or carriers or upon interstate commerce. When any petition shall be filed with the Commission under the provisions of this paragraph the Commission shall notify the Governor of the State in which such train or ferry is operated at least thirty days in advance of the hearing provided for in this paragraph, and such hearing shall be held by the Commission in the State in which such train or ferry is operated; and the Commission is authorized to avail itself of the cooperation, services, records and facilities of the authorities in such State in the performance of its functions under this paragraph.

4905.21, Ohio Revised Code.[2] Although public hearings were held before PUCO in March, no final decision had been forthcoming by October 23, 1973. On that day the Trustees, alleging that the substantial daily loss due to the delay in obtaining discontinuance was dissipating the assets of the Debtor, moved the district court to authorize immediate discontinuance of the two trains. The Trustees alleged that the court was empowered to do so under Sections 77(a) and 77(c)(2) of the Bankruptcy Act.[3]

On November 6, 1973, the district court, plainly exasperated by the delay and with little notice, granted the re-

---

**2.** Section 4905.21, Ohio Revised Code, provides:

> *4905.21 Application for abandonment.*
>
> Any railroad or any political subdivision, desiring to abandon, close, or have abandoned, withdrawn, or closed for traffic or service all or any part of a main track or depot, and any public utility or political subdivision desiring to abandon or close, or have abandoned, withdrawn, or closed for traffic or service all or any part of any line, pumping station, generating plant, power station, sewage treatment plant, or service station, referred to in section 4905.20 of the Revised Code, shall make application to the public utilities commission in writing. The commission shall thereupon cause reasonable notice of the application to be given, stating the time and place fixed by the commission for the hearing of said application.
>
> Upon the hearing of said application, the commission shall ascertain the facts and make its findings thereon, and if such facts satisfy the commission that the proposed abandonment, withdrawal, or closing for traffic or service is reasonable, having due regard for the welfare of the public and the cost of operating the service or facility, it may allow such abandonment, withdrawal, or closing; otherwise it shall be denied, or if the facts warrant, the application may be granted in a modified form. If the application asks for the abandonment or withdrawal of any main track, main pipe line, gas line, telegraph line, telephone toll line, electric light line, water line, sewer line, steam pipe line, pumping station, generating plant, power station, sewage treatment plant, service station, or the service rendered thereby, in such manner as can result in the permanent abandonment of service between any two points on such railroad, or of service and facilities of any such public utility, no application shall be granted unless the railroad or public utility has operated said track, pipe line, gas line, telegraph line, telephone toll line, electric light line, water line, sewer line, steam pipe line, pumping station, generating plant, power station, sewage treatment plant, or service station for at least five years. Such notice shall be given by publication in a newspaper of general circulation throughout any county or municipal corporation which has granted a franchise to said railroad or public utility, under which said track, pipe line, gas line, telegraph line, telephone toll line, electric light line, water line, sewer line, steam pipe line, pumping station, generating plant, power station, sewage treatment plant, or service station is operated or in which the same is located, once a week for four consecutive weeks before the hearing of said application. Notice of said hearing shall be given such county, municipal corporation, or public utility in the manner provided for the service of orders of the commission in section 4903.15 of the Revised Code. This section and section 4905.20 of the Revised Code do not apply to a gas company when it is removing or exchanging abandoned field lines.
>
> This section applies to all service now rendered and facilities furnished or hereafter built and operated, and an order of the public utilities commission authorizing the abandonment or withdrawal of any such service or facility shall not affect rights and obligations of a railroad or public utility beyond the scope of said order, anything in its franchise to the contrary notwithstanding.

**3.** Section 77(a) of the Bankruptcy Act, 11 U.S.C. § 205(a) provides in part:

> (a) Any railroad corporation may file a petition stating that it is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization. The petition shall be filed with the court in whose territorial jurisdiction such corporation, during the preceding six months or the greater portion thereof, has had its principal executive or operating office, and a copy of the petition shall at the same time be filed with the Interstate Commerce Commission (hereinafter called the "Commission"): *Provided,* That when any railroad, although engaged in interstate commerce, lies wholly within one State, such proceedings shall be brought in the Federal district court of the district in which its principal operating office in such State during the preceding six months or the greater portion thereof has been located. The petition shall be accompanied by payment to the clerk of a filing fee of $100, which shall be in addition to the fees required to be collected by the clerk under other sections of this title. Upon the filing of such a petition, the judge shall enter an order either approving it as properly filed under this section, if satisfied that such petition complies with this section and has been

quested relief, to be effective, however, February 15, 1974.[4]

Appellants assert that the district court lacked the power under Section 77 of the Bankruptcy Act to disregard the pending state proceeding and to order the discontinuance directly. In *Palmer* v. *Massachusetts, supra,* creditors of a railroad in reorganization sought an order from the district court directing the Trustees to abandon certain intrastate passenger service. Although an application to the Massachusetts Department of Public Utilities had been filed and no approval or other disposition had been made by that agency, the federal court granted the requested relief. The Supreme Court held that Congress did not intend by Section 77 to vest such power in a single judge:

The judicial process in bankruptcy proceedings under § 77 is, as it were, brigaded with the administrative proc-

filed in good faith, or dismissing it, if he is not so satisfied. If the petition is so approved, the court in which such order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose.

\* \* \* \* \* \*

Section 77(c)(2), 11 U.S.C. § 205c(2) provides in part:

(2) The judge shall fix the amount of the bond of every trustee. He may thereafter terminate any such appointments on cause shown, and may in that event and in the event of a vacancy from any other cause, in the manner and within the qualifications herein provided for the appointment of trustees, appoint a substitute trustee or trustees, and in the same manner and within the same qualifications may appoint an additional trustee, and shall fix the amount of the bond of every such substitute or additional trustee or trustees. The judge shall in his discretion confirm the appointment of such legal counsel for the trustees as they shall select, with power of removal. The trustee or trustees and their counsel shall receive only such compensation from the estate of the debtor as the judge may from time to time allow within such maximum limits as may be approved by the Commission as reasonable. The trustee or trustees so appointed, upon filing such bond, shall have all the title and shall exercise, subject to the control of the judge and consistently with the provisions of this section, all of the powers of a trustee appointed pursuant to section 72 or any other section of this title, and, to the extent not inconsistent with this section, if authorized by the judge, the powers of a receiver in an equity proceeding, and, subject to the control of the judge and the juris-

diction of the Commission as provided by chapter 1 of Title 49 as on August 27, 1935, or thereafter amended, the power to operate the business of the debtor.

4. On February 7, 1974, the district court entered a stay of the order of discontinuance primarily because it conceived that any interim discontinuance was prohibited by the provisions of § 304(f) of the Regional Rail Reorganization Act of 1973, (the Rail Act), 45 U.S.C. § 701 et seq., at least until discontinuance was authorized by the newly created United States Railway Association, or the railway was taken out of the operation of the Rail Act by appropriate determinations under Section 207(b) that it was reorganizable on an income basis under § 77 of the Bankruptcy Act. We do not consider the issue mooted by the stay under the circumstances, particularly since the district court later determined that Erie Lackawanna was so reorganizable.

Section 304(f) provides:

(f) Interim Abandonment.—After the date of enactment of this Act, no railroad in reorganization may discontinue service or abandon any line of railroad other than in accordance with the provisions of this Act, unless it is authorized to do so by the Association and unless no affected State or local or regional transportation authority reasonably opposes such action, notwithstanding any provisions of any other Federal law, the constitution or law of any State, or decision or order of, or the pendency of any proceeding before any Federal or State court, agency, or authority.

Section 207(b) provides:

(b) Approval.—Within 120 days after the date of enactment of this Act each United States district court or other court having jurisdiction over a railroad in reorganization shall decide whether the railroad is reorganizable on an income basis within a reasonable time under section 77 of the Bankruptcy Act (11 U.S.C. 205) and that the public interest would be better served by continuing the present reorganization proceedings than by a reorganization under this Act.

ess of the [Interstate Commerce] Commission.

From the requirement of ratification by the Commission of the trustees appointed by the Court to the Commission's approval of the Court's plan of reorganization the authority of the Court is intertwined with that of the Commission. Thus, in § 77, sub. c, and § 77, sub. o, the power of the district courts to permit abandonments is specifically conditioned on authorization of such abandonments by the Commission. In view of the judicial history of railroad receiverships and the extent to which § 77 made judicial action dependent on approval by the Interstate Commerce Commission, it would violate the traditional respect of Congress for local interests and for the administrative process to imply power in a single judge to disregard state law over local activities of a carrier the governance of which Congress has withheld even from the Interstate Commerce Commission, except as part of a complete plan of reorganization for an insolvent road. 308 U.S. at 87–88, 60 S.Ct. at 38 (footnotes omitted)

Appellants further contend that, if the Trustees were dissatisfied with the progress or results of the PUCO proceedings, they were obliged to petition the ICC for relief under Section 13a(2) of the Interstate Commerce Act or abide by, the state agency's decision. Section 13a(2) provides an optional federal administrative remedy which may be sought 120 days after application to the state agency. It permits the ICC, after hearing, to authorize discontinuance of a train operated wholly within a single state whenever the appropriate state agency has denied a petition or failed to act upon it within 120 days of its presentation.

With an express statutory remedy for state agency delay, why did not the Trustees, at the expiration of 120 days without action, apply directly to the Interstate Commerce Commission instead of waiting ten months and then applying to the district court? And why did not

the district court require the Trustees first to apply to the ICC?

The Trustees' reason for their own delay is given as their reasonable belief, based upon preliminary indications, that favorable action upon their application would be forthcoming from PUCO momentarily, a hope which over the months finally faded into despair.

The district court's reasons for granting direct relief are set out in findings incorporated in its order. They are findings which voice the frustrations of the ailing railway industry generally, frustrations inherited by reorganization courts charged with the responsibility of accommodating both the public interest and the very immediate needs of an insolvent corporation, pressed by creditors and strapped for cash. Citing the dismal economic facts as brought out before PUCO, the district judge condemned the state agency's "protracted delay" and "abdication of responsibility" which resulted "in a continuing erosion of assets of a railroad already experiencing critical financial difficulties [and which] presents to this Court a constitutional question of taking of the Debtor's property without due process of law". The district court then observed that

"the northeastern railroads can ill afford the luxury of elaborate, costly, time consuming procedures demanded by the concept of exhaustion of administrative remedies before either the Interstate Commerce Commission or the PUCO before seeking the more direct route of judicial relief". .

Directing itself to *Palmer* v. *Massachusetts, supra,* which the court characterized as an "outmoded 1939 mandate", the court concluded that "contemporary conditions dictate a departure from the archaic doctrine of *Palmer* designed to resolve issues confronting the railroad industry during its more prolific era".

The district court here has aligned itself with the position taken by Judge Aldisert in his forceful dissent in *In Re Central Railroad Company of New Jersey, supra.* While we recognize the sense of urgency which must have

prompted the dissent there and the district judge's comments here, we nevertheless, agree with the majority that:

"However, the blunt fact is that Palmer has not been undercut by subsequent decisions of the Supreme Court, nor has its vitality been called into question." 485 F.2d at 213

We are not persuaded by efforts to distinguish *Palmer* from the facts of this case. In *Palmer* the district court authorized discontinuance of intrastate passenger service where, like here, an application for the same relief was pending before the appropriate state administrative agency. The Supreme Court held the district court was without power to order the discontinuance.

It is true that *Palmer* was decided before Congress amended the Interstate Commerce Act in 1958 to add Section 13a(2). The amendment is, however, not only consistent with *Palmer*, but its enactment is further evidence of Congressional preference for an administrative rather than a judicial remedy. The legislative history to the 1958 amendment indicates that Congress was aware of the potential for arbitrariness and harmful delay by state agencies, and sought to correct that inequity by providing for resort to the Interstate Commerce Commission:

Because of this delay in authorizing, or absolute refusal to authorize, discontinuance of little-used services, it is proposed to add a new section 13a to the act, whereby the railroads, at their option, may have the Interstate Commerce Commission, rather than State commissions, pass upon the discontinuance or change in the operation or service of any train or ferry. This option is limited, however, to the operation or service of a train or ferry on a line of railroad not located wholly within a single State. This limitation is contained in the bill being reported because the committee feels that the record at this time does not support the broader change in venue, requested by the railroads, which would have covered Interstate Commerce Commis-

sion jurisdiction also over operations more local in character, such as those of a branch line or other line of railroad located solely within one State. House Report No. 1922, 1958 U.S.Code Congressional and Administrative News 3456.

While expressing concern about possible state abuses, nothing in the legislative history nor in the act itself suggests any Congressional intent to grant judicial power to authorize the discontinuance of rail service under such circumstances without administrative approval. On the contrary, the grant of power to the Commission was consistent both with *Palmer* and with the historical preference for administrative expertise in matters involving the operations of railroads. See e. g., *New Haven Inclusion Cases*, 399 U.S. 392, 431–432, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *In the Matter of Central Railroad Co. of New Jersey, supra*, 485 F.2d at 213. While Congress undoubtedly has power to entrust this responsibility to the district courts, it deliberately has not done so.

Here the Trustees neither awaited a final decision from PUCO nor sought the plain relief from delay which the statute afforded them. That they were expecting a favorable decision from PUCO may be a reason for their own delay in acting, but it cannot legally excuse their failure to pursue the alternative remedy.

Likewise, we are unable to agree with the district court finding that resort to the ICC under Section 13a(2) would be futile and that requiring the passenger service to continue would be tantamount to a taking of the railroad's property without due process of law. While it has been held that a railroad may not be required to continue its business in the face of confiscatory losses, *Brooks-Scanlon Co.* v. *Railroad Commission*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920); *Railroad Commission of Texas* v. *Eastern Texas Railroad Co.*, 264 U.S. 79, 44 S.Ct. 247, 68 L.Ed. 569 (1924), in both of those cases the railroad had sought to suspend its operations entirely. Railroads have not been permitted to use

that argument to justify the discontinuance of an unprofitable portion of their operating franchise while continuing to accept the benefits of that portion which they conceive to be advantageous. *Alabama Public Service Commission* v. *Southern Railway,* 341 U.S. 341, 347, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); *Ft. Smith Light and Traction Co.* v. *Bourland,* 267 U.S. 330, 45 S.Ct. 249, 69 L.Ed. 631 (1925). Cf. *New Haven Inclusion Cases,* 399 U.S. 392, 491–492, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

So serious a charge against an agency of the federal government ought at least be supported by a convincing factual record. We find none at all here. Absent such a record and absent any evidence of a good faith effort to seek the remedy specifically provided by the Congress, the Trustees cannot be heard to complain that resort to it would be futile.

After Order No. 169 was entered but before it was to become effective, the Congress enacted the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq., which contains special procedures for the discontinuance of service by railroads in reorganization. We note that the district court by order dated April 30, 1974, has determined that Erie Lackawanna is reorganizable under Section 77 of the Bankruptcy Act.[5] We make no determination here of the impact either of that order or of the operation of the 1973 Rail Act generally, other than to hold that in any event the order of discontinuance was improvidently issued and must accordingly be vacated.

Reversed and remanded for proceedings consistent with this opinion.