In the Matter of The **NEW YORK, SUSQUEHANNA & WESTERN RAILROAD COMPANY.**

No. B 76–182.

United States District Court, D. New Jersey.

Nov. 18, 1980.

amount to be awarded. *Memphis Sheraton Corp. v. Kirkley*, 614 F.2d 131 (6th Cir. 1980).

Walter Rich, President and Chief Ex. Officer, Delaware Otsego Corp., New York City, Richard Honig, Howard S. Greenberg, Ravin, Katchen & Greenberg, Newark, N. J., for Trustee.

Bernard Cedarbaum, Carter, Ledyard & Milburn, New York City, for Indentured Trustee U.S. Trust Co.

Robert M. Maidman, New York City, for Series A Bondholders.

William P. Quinn, Fell, Spalding, Goff & Rubin, Philadelphia, Pa., for Delaware Otsego Corp.

Donald Lampson, Elkind & Lampson, New York City, for United Trans. Union.

John H. Broadley, U. S. Dept. of Justice, Washington, D. C., Walter Scott, Sr., Ridgefield Park, N. J., for Trustee, N. Y. Susquehanna & Western RR Co.

Charles A. Spitulnik, Highsaw, Mahoney & Friedman, Washington, D. C., for Railway Labor Executives Assoc.

J. Sheldon Cohen, Schneider, Cohen & Solomon, Jersey City, N. J., local counsel. Thomas A. Woodley, Muholland, Hickey, Lyman, McCormick, Fisher & Hickey, Washington, D. C., for Railway Employees Dept. IAM.

Michael R. Griffinger, Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for Indentured Trustee Chemical Bank.

Jerome A. Vogel, Jeffer, Walter, Tierney, DeKorte, Hopkinson & Vogel, Paterson, N. J., for Shippers Task Force.

Richard A. Allen, General Counsel, Washington, D. C., Edward Roberts, III, Kelley, Drye & Warren, New York City, for Indentured Trustee Manufacturer's Hanover.

Joseph L. Yannotti, Deputy Atty. Gen., State of N. J., Trenton, N. J., William J. McGee, Lum, Biunno & Tompkins, Newark, N. J., for Debtor, N. Y. Susquehanna.

Kenneth S. Levy, Deputy Atty. Gen., State of N. J., Trenton, N. J., Lewis N. Wilson, Chatham, N. J., Marc N. Isenberg, Osterweil, Wind & Loccke, Edgewater, N. J., John B. Murray, Connell, Foley & Geiser, Newark, N. J., Internal Revenue Service, Special Procedure Section, Newark, N. J., Susan Engelman, Asst. U. S. Atty., Newark, N. J., Donald F. Luke, Rogers & Wells, New York City, for Committee on Interlines.

Gary Newman, Newman & Cary, East Orange, N. J., for Delaware Oswego.

Weisman, Celler, Speet, Modlin & Wertheimer, New York City, Special Counsel to Trustee. (No appearance.)

William C. Struyk, Cravath, Swain & More, New York City, for Chemical Bank.

## OPINION

WHIPPLE, Senior District Judge.

TO ALL COUNSEL OF RECORD:

Presently pending before this Court is the Second Amended Plan of Reorganization (the "Plan") for the New York, Susquehanna & Western Railroad Company ("NYS&W"). While a determination as to approval or disapproval of the Plan shall not be made by this Court until a report on the Plan is received from the I.C.C.[1], one important issue pertaining to the Plan is ripe for adjudication at this time. This issue is the question of whether or not this Court must impose certain labor protection provisions in this case, either through a requirement that the Plan include such provisions, or otherwise. According to the Milwaukee Railroad Restructuring Act, 45 U.S.C. 901, 915, determination of the labor protection issue is within the province of the Court, and not the I.C.C. *See also New York, S. & W.R. Co.—Abandonment*, Docket No. B–210 (Sub. No. 1) (Aug. 12, 1980); *In re Chicago, Rock Island & Pacific R. Co.*, No. 75–B–2697 (N.D.Ill., June 2, 1980).

In such a situation, the imposition of labor protection provisions may be discretionary or mandatory and may depend upon the specific circumstances of the given case.

Accordingly, the two questions to be addressed are:

---

1. At the request of the I.C.C. this Court extended the time for submission of the I.C.C.'s report until December 29, 1980. See letter of this Court dated October 31, 1980.

1. Is the disposition of assets heretofore ordered by this Court and presently being carried out by the Trustee an "abandonment" or a "sale or transfer"?
2. If the disposition is an abandonment, must labor protection provisions be imposed?

*Abandonment vs. Sale or Transfer*

■ In order to put the analysis of the disposition of the assets of NYS&W into perspective, a brief summary of recent events in this reorganization is required.

In July 1979, this Court determined that the creditors had suffered an unconstitutional taking of their property, and that the debtor was not reorganizable. This Court thereafter ordered the Trustee to cease railroad operations and to commence an orderly liquidation of its assets. (July 12, 1979 Opinion and Order No. 81). In August, 1979, this Court modified Order No. 81, directing the Trustee to file with the Interstate Commerce Commission ("ICC") and the New Jersey Department of Transportation ("NJDOT") "all appropriate applications and supporting documents necessary to bring before those agencies the termination and abandonment of the entire operation of the debtor." (August 24, 1979 Opinion and Order 83). The ICC and NJDOT were further ordered to submit reports to this Court on the Trustee's applications. Orders 81 and 83 were affirmed by the United States Court of Appeals for the Third Circuit on September 30, 1980. In the matter of *New York, Susquehanna & Western Railroad Co.*, 633 F.2d 210 (3d Cir. 1980).

In an effort to conform to the District Court's order, the Trustee petitioned the ICC under 49 U.S.C. § 10505 for exemption from certain procedural requirements. On November 4, 1979, the Milwaukee Railroad Restructuring Act, P.L. 96–101, 93 Stat. 736, 45 U.S.C. 901 *et seq.* ("Milwaukee Act") became law. The effect of the passage of the Milwaukee Act was to cause the ICC to dismiss as moot the Trustee's application for exemption. *ICC Decision, Walter G. Scott, Trustee-Exemption Under 49 U.S.C. 10505*, Docket No. AB–210 (Nov. 29, 1979) (hereinafter "Trustee's Exemption"). The ICC held that "NYSW meets the criteria of ... [Section 17(a) of the Milwaukee Act] ... the Bankruptcy Judge may approve abandonment regardless of Commission action." *Trustee's Exemption.*

The Trustee thereafter resubmitted materials to the ICC, and on August 12, 1980, that agency filed a report and recommendation with this Court. In that document, the ICC recommended that the Trustee should be permitted to abandon the debtor's entire line. *New York Susquehanna and Western Railroad Company-Abandonment*, Docket No. AB–210 (Sub. No. 1) (service date August 12, 1980) (hereinafter "*NYS&W Abandonment*").

Consistent with New Jersey's regulatory process, a hearing was held before the Administrative Law Judge on the Trustee's application to discontinue operations and abandon the line. In her Initial Decision, which was adopted as the Final Decision of the NJDOT on August 27, 1980, Judge Sybil Moses ordered that the Trustee's application to discontinue and abandon operations be granted.

The debtor has been operating at a loss since it went into reorganization in January 1976. *NYS&W Abandonment*, at 2. This Court has repeatedly concluded that there is no possibility that the debtor can continue to operate under present conditions, given the deterioration of its physical plant, and its untenable financial position.

On March 21, 1979 the Department of Transportation completed an analysis of the costs of upgrading the Railroad's tract to FRA Class 2 standards. The Department of Transportation estimated the costs of upgrading the debtor Railroad track (not including the cost of reconstruction of bridges and grade crossings) to be approximately $1,700,000.00.

Three separate engineering surveys, commissioned by the Department of Transportation, estimated the costs of rehabilitation of the three most deteriorated bridges on

the Debtor Railroad's Line at $1,497,000.00, subject to operating changes which would cause the need for such repairs to be diminished. The Debtor does not have funds for these projects, nor has it shown the ability to generate them.

The debtor began the year 1980 employing 59 people. (Transcript September 23, 1980, at 71). However, car loadings, the source of the Railroad's revenue, have shown an alarming rate of decline. In the first half of 1980, car loadings fell 21.7 percent over the corresponding figure for the first half of 1979. (Trustee's Petition filed August 22, 1980). More importantly, the debtor showed an $83,598.00 loss in the first quarter of 1980. (Financial statement annexed to Trustee's August 22, 1980 Petition). Total railway operating revenue was $507,455.00 for the first quarter of 1980; if this figure is annualized, the railroad could be expected to gross only $2,029,816.00 from operations in 1980.

With these negative financial factors at work, and consistent with the earlier mandate of this Court in Orders 81 and 83, the Trustee undertook the liquidation of the debtor. Efforts by the Trustee and the NJDOT produced bids for assets of the Debtor in various forms. After hearings and careful consideration, this Court found the bid of the Delaware Otsego Corporation ("DO") to be the most favorable offer as far as the estate and its creditors are concerned.

On August 5, 1980, this Court entered Order 104, which approved the contract between the Trustee, the offeror, DO, and its new subsidiary, the New York Susquehanna & Western Railway Corporation ("New NYS&W"). That agreement provides in pertinent part that the New NYS&W would purchase from the Trustee certain of the debtor's abandoned rail assets which were being liquidated. New NYS&W was incorporated on March 17, 1980, and prior to its takeover of the debtor's line of September 2, 1980, New NYS&W had never operated as a carrier. (August 1, 1980 Agreement of Sale, ¶ VI(B), Exhibit A to Trustee's Petition for Approval of Contract filed August 1, 1980) (hereinafter "Agreement").

One of the conditions precedent to closing under the Agreement is the receipt of final judicial and regulatory approval of the transaction, without conditions materially increasing the cost of the transaction to DO and New NYS&W. This term includes specifically any conditions requiring DO or New NYS&W to make any payment to any employees of Susquehanna, DO or New NYS&W other than those specified in the Agreement. Agreement, paragraph X(b).

Based upon the foregoing facts and the legal analysis which follows, the conclusion is inescapable that the transaction before the Court constitutes a complete abandonment of the debtor's rail line and a total termination of service. This course was ordered by this Court long before any entity manifested to this Court an interest in obtaining operating control of any portion of the debtor's line. This transaction does not constitute a "sale or transfer" within the meaning of any applicable statute or regulation. The Trustee does not simply "abandon his abandonments," see *In re Chicago, Milwaukee, S.P. & P.R. Co.*, No. 77–B–8999 (N.D.Ill., filed 2/29/80); he is under a fiduciary duty to reduce to money the property of the estate, for distribution to creditors. Hence, this abandonment is followed by, and is part of, a liquidation of the debtor, it is not a sale or transfer. The Trustee is bound to abandon this line and to terminate all service regardless of whether the transaction with the new carrier is accomplished. That the liquidation of this estate may involve the conveyance of a portion of the debtor's assets to a single entity which will attempt to provide rail services does not negate the fact that in July and August 1979, this Court adjudicated the debtor unreorganizable and ordered cessation of operations and liquidation. Authority to effectuate abandonment of operations and cessation of service was bound to be pursued by the Trustee whether the assets were sold piecemeal or in bulk. The Trustee's sale to the New NYS&W does not transmute into a sale or transfer the proceedings leading to the issuance of authority to abandon.

It is clear that section 17(a) of the Milwaukee Act, and not Section 17(b), applies to this case; the ICC has so held, *Trustee's Exemption*. Further, The Milwaukee Railroad reorganization court has held that § 5(a) of the Milwaukee Act (the analogue of section 17(a) applicable specifically to Milwaukee), rather than section 5(b), dealing with the sale or transfer of lines of the Milwaukee Railroad, applies where the Trustee is engaged in the conveyance to a non-carrier (such as New NYS&W) of lines to be abandoned. *In re Chicago, Milwaukee, S.P.&P.R. Co.*, No. 77-B-8999 (N.D.Ill., filed 2/29/80, slip op. at 4-5).

This case clearly involves the total abandonment of the debtor's rail service by the Trustee. "Discontinuance of operations by the Trustee is abandonment", *Smith v. Hoboken Railroad, W. & S.C.*, 328 U.S. 123, 130, 66 S.Ct. 947, 949, 90 L.Ed. 1123 (1946), which "unlike an embargo, is characterized by an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line." *ICC v. Chicago & Northwestern Transportation Co.*, 533 F.2d 1025, 1028 (8th Cir. 1976); *ICC v. Chicago, Rock Island & Pacific Railway Company*, 501 F.2d 908 (8th Cir. 1974), cert. denied, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975).

Thus, in the context of this proceeding, the orders entered herein and the steps taken to dispose of the property of the estate in an orderly liquidation, it is clear that an abandonment procedure has been followed and not a sale or transfer. Insofar as the total abandonment procedure is incorporated in the Plan, this Court hereby approves and authorized such abandonment of the estate's properties.

*Mandatory vs. Discretionary Labor Protection*

We turn now to consideration of the labor protection issue in an abandonment setting. The financial condition of the debtor has worsened, with one important exception, throughout the course of these proceedings. In mid-1979, in an effort to arrest the decline, and to attempt to formulate an income-based plan of reorganization, NJDOT hired the railroad consulting firm of L.E. Peabody and Associates (hereinafter "Peabody"). Peabody submitted a number of reports to this Court, portions of which have particular relevance to the issues before this Court at this juncture. These reports, the Trustee's attempts to implement the recommendations contained therein, and the results of the Trustee's efforts, establish that the financial problems of this Railroad are based in large part on the fact that the Trustee has been compelled to operate in accordance with certain collective bargaining agreements which provide for uneconomical staffing of the Railroad.

In its June 18, 1979 report on Institutional Alternatives to Service, Peabody analyzed the debtor's manning requirements, and concluded that, as of May 9, 1979, the debtor was significantly overstaffed. (Page 9). Peabody recommended certain personnel changes be instituted in an effort to cut costs.

Thereafter, the Trustee began to take steps to implement the "rationalization" of the debtor, as recommended by Peabody, which included lay-offs and relocation of various railroad personnel. (Trustee's Petition for Extension of Time to File a Plan, filed June 22, 1979; Transcript, July 2, 1979, at 9-11).

In its August 9, 1979 Analysis of Current Operations, Peabody noted that "a significant amount of over-staffing and under-utilization of personnel was found to exist on the NYS&W." (Page 2). Peabody suggested a general restructuring of the labor force, including the elimination of 27 jobs, the functions of which would be replaced by 7 jobs. The 7 jobs created were managerial; and Peabody, therefore, recommended, as a cost reduction strategy, the termination of from 18 to 20 contract employees. As envisioned by Peabody, the "rationalized" debtor would require only 52 employees, assuming its traffic volume produced revenues of $2,549,000.00. (August 9, 1979 Institutional Alternatives Report, pp. 9-13).

The management of the debtor reported on August 15, 1979 that employee terminations had resulted in cost savings that were expected to be improved by additional and continued lay-offs and job abolishments. (Transcript, August 15, 1979, at 14, 44–45). Thus, it is clear that the debtor began reducing its work force as early as June 1979, pursuant to recommendations of the Peabody management consulting firm and the NJDOT, in an effort to reorganize on an income basis. Although the debtor showed less of a loss in 1979 ($170,845.00) than in previous fiscal years during this proceeding, unfortunately management's efforts were not sufficient to make this railroad profitable. It is significant to note, however, that attempts to rationalize the labor force led to the debtor's best financial performance.

Losses, while reduced, nonetheless continued to reflect the inability of this railroad to turn itself around. As indicated above, gross revenues were also declining to an annual figure of approximately $2,000,000. The Peabody report assumed that with only 52 employees, profitability could be achieved, *provided* gross revenues remained in the range of $2,500,000. Thus, even as rationalization proceeded, the assumptions underlying the Peabody analysis were undercut.

Testimony adduced at the September 23 hearing confirms the fact that less employees are needed as the volume of business declines. Although the debtor had only 25 employees as of August 29, 1980, it was able to accomplish this 58 percent reduction of its work force over a period of 9 months with no adverse impact on its operational capacity. This reduction of approximately 34 employees from January to September 1980 was possible through significant attrition in the clerical area, additional mechanization within the track maintenance department, and the general decline in business.

Of the 25 persons employed by the debtor on August 29, 1980, 23 were hired by the New NYS&W. One employee died over the Labor Day weekend; consequently, only *one* of the people employed by the Trustee on the date he ceased operation was not hired by the new carrier. That person not employed by New NYS&W is receiving benefits from Delaware Otsego.

By posting of notice, or publication, well in advance of August 29, 1980 every employee knew or should have known of the pending negotiations between the Trustee and various interested parties, and the likelihood of the sale of the debtor's abandoned line to a new carrier.

In addition, RLEA had actual knowledge of events as they transpired by reason of its active participation in this proceeding. Despite this fact, there is no proof that RLEA ever made formal demand on either the Trustee, Delaware Otsego, or New NYS&W to engage in collective bargaining on the various aspects of termination of existing employees and reassignment of forces to the new carrier. Were RLEA, or any other responsible labor organization to have made such a demand, it seems unlikely that numerous individual employees would have felt it necessary, prior to August 29th, to initiate contact with the Trustee regarding either separation settlements, or their continued employment by the new carrier. As a result of those negotiations, and after being advised that the cash received from the Trustee or Delaware Otsego would be in full settlement of any and all claims which they could have against either the Trustee or Delaware Otsego, between 15 and 18 employees executed documents which on their faces appear to be general and complete releases of all of their claims. See Exh. T–1 and T–2. These releases are valid in all respects, and there is no evidence that they were not knowingly and willingly executed by the releasors. None of the employees who negotiated with the Trustee about settlement and separation complained of the results reached.

The aforementioned employees who executed releases left the Trustee's employment voluntarily, and in so doing, manifested an unwillingness to work for the new carrier.

In July 1980, for the first time in 15 years the Railroad required physicals of all em-

ployees; those employees averaged 50 years of age. To require physicals is not a violation of any collective bargaining agreement which has been placed before the Court; rather, such physicals are, according to an employee-witness, a beneficial way to ensure the safety of employees performing physical labor. Three of the existing employees failed the physical; one was subsequently restored after one day, but then voluntarily left the Trustee's employ and executed a release. Thus, two employees were terminated in July, 1980, for failing the physical.

Although the job titles of the debtor's former employees may have changed, their duties have not. No employee is performing work which he would rather not do, or that is beyond his physical capacity. Hourly wage rates of the employees of the new carrier are equal to or higher than those paid by the Trustee. New NYS&W does not pay time and one-half for overtime. However, all fringe benefits are provided by the new carrier, and are equal to, or superior to those which were provided by the Trustee.

Former employees of the debtor are being given priority in filling positions on the new carrier which may be required in connection with rehabilitation of the line.

In light of the foregoing, this Court must evaluate the necessity for imposing labor protection conditions upon the estate. This analysis shall proceed in the context of the conclusion previously reached that the disposition of the assets of the debtor constitutes a court-authorized abandonment consistent with Section 17(a) of the Milwaukee Act.

The Milwaukee Act shifted the authority over the issue of labor protection from the ICC to this Court. Both section 17(a) of the Milwaukee Act, dealing with abandonments, and section 17(b) of the same Act, dealing with the sale or transfer of lines, provide that a reorganization court shall see to it that employees are protected according to 49 U.S.C. § 11347. Contrary to this Court's conclusion that this case is a section 17(a) abandonment, RLEA contends that section 17(b) of the Milwaukee Act applies to this case, and that the minimum level of labor protection which this Court must apply are those standards articulated in *New York Dock R. Co. v. United States*, 609 F.2d 83 (2nd Cir. 1979), or *Oregon Short Line Railroad—Abandonment*, 360 I.C.C. 91 (1979).

Discussion of the statutory framework governing this case is somewhat complicated by the codification and restatement, without substantive change, of the Interstate Commerce Act, P.L. 95–473 (October 17, 1978), 49 U.S.C. § 10101 *et seq.* Under that statute, applications to abandon a line of railroad were filed with the Commission under 49 U.S.C. § 10903, which was formerly section 1(18) of the Act. On the other hand, applications for consolidation, merger or purchase of property of a carrier by another carrier were filed under 49 U.S.C. § 11343, which was formerly section 5(2) of the Act. 49 U.S.C. § 11347, referred to in the Milwaukee Act as the statute to which this Court should look for guidance in the area of labor provisions, on its face applies only to the "consolidation/merger" type of case, initiated under 49 U.S.C. § 11343 (formerly section 5(2)).

The policy behind the important distinction between abandonments and consolidation/merger cases was explained by the Interstate Commerce Commission in *Okmulgee Northern Railway Company Abandonment*, 320 I.C.C. 637, 639–640 (1964):

The congressional purpose in enacting section 5(2)(a) in its present form was to facilitate voluntary merger and consolidation in the national transportation system. *County of Marin v. United States*, 356 U.S. 412, 416–418, 98 S.Ct. 880, 881, 2 L.Ed.2d 879 (1958). As indicated by the history of the legislation, Congress was much concerned with the survival of railroads that were in weak condition and with the steps which might be taken to promote carriers' survival. The great dependence previously placed on competition among railroads to invigorate our railroad economy, was to be moderated where necessary for such survival, and, in

the interest of the maintenance and development of an economic and efficient railroad system, consolidation was to be made easier... That section 5 contemplates rail merger and unification of properties and operations as a step in continuing the enterprise as distinguished from situations where, as here, the one carrier is abandoning its entire line and operations is made clear by the decision in *Schwabacher v. United States*, 334 U.S. 182 [68 S.Ct. 958, 92 L.Ed. 1305] (1948) ... As distinguished from section 5(2) which governs the unification of continuing enterprises, section 1(18) was intended and designed to cover abandonments, acquisitions and extensions of lines of railroad. 320 I.C.C. 639–640.

■ The total cessation of operations and liquidation ordered by this Court is a complete abandonment. *I.C.C. v. Chicago & Northwestern Transportation Co., supra; I.C.C. v. Chicago, Rock Island & Pacific Railway Company, supra.* Does an abandonment carry with it the mandatory requirement that labor protection conditions be imposed? The answer appears to be clearly: No.

■ Rather than being required to do so, this Court has discretion whether or not to impose labor protection provisions. *In re Chicago, Rock Island & P. R. Co.*, No. 75–B–2697, Order No. 248 (N.D.Ill. filed June 2, 1980). In the exercise of its discretion, it is appropriate for the Court to consult ICC rulings issued while that agency had authority over the issue of labor protection, in determining the standards and factors to be applied to a total abandonment of a carrier. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Lehigh & N. E. R. Co. v. I. C. C.*, 540 F.2d 71, 80 (3d Cir. 1976). As will become apparent, in cases of total abandonment, prior to the passage of the Milwaukee Act, the ICC had consistently refused to impose any labor protective provisions at all. Further, after passage of the Milwaukee Act, the only

Court faced with the issue has also refused to impose labor protection in a case of total abandonment, such as obtains in the within matter. *Rock Island, supra.* For the reasons which follow, no labor protection will be imposed in this case, upon either the Trustee, the New NYS&W or Delaware Otsego.

The ICC has characterized abandonment applications under former section 1(18) of the Interstate Commerce Act, (which would be applicable here but for the passage of the Milwaukee Act), as falling into three general groups:

(1) Abandonment of entire properties by carriers which are no longer able to continue the struggle for survival because of highway competition or other conditions depriving them of sufficient means of livelihood; (2) Partial abandonments by generally unprosperous carriers in the effort to reduce expenses and thereby preserve service to the public on their remaining lines; and (3) Abandonment of main lines, branch lines, or parts of lines by carriers, not *in extremis*, where abandonment is warranted and desirable as a benefit to the transportations system, but, in the language of the court, results also in a private benefit for the railroad in the form of savings realized by discontinuing uneconomic service. *Chicago, A. & S. R. Receiver Abandonment*, 261 I.C.C. 646, 651 (1956).

The distinction between partial and total abandonments has been recognized as important by this Court and other Courts, in the related situation where creditors assert their *Brooks-Scanlon*[2] rights. See July 12, 1979 Opinion; *In re Central Railroad of New Jersey*, 485 F.2d 208, 214 (3d Cir. 1973), *cert. denied sub nom.; Timpany v. New Jersey*, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974); *In re Erie Lackawanna Railway Company*, 517 F.2d 893, 898 (6th Cir. 1975); *In re New York, New Haven & Hartford Railroad Company*, 304 F.Supp. 793, 802 (D.Conn.1969), *modified* 399 U.S.

**2.** *Brooks-Scanlon Company v. Railroad Commission*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920).

392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970); *Brooklyn Eastern District Terminal v. United States*, 302 F.Supp. 1095 (E.D.N.Y.1969). In the *Central Railroad* case, the Third Circuit specifically distinguished the *Brooks-Scanlon* line of cases based on the fact that Jersey Central only sought partial abandonment. 485 F.2d at 214. This Court in turn distinguished *Jersey Central*, in favor of *Brooks-Scanlon*, on the ground that this debtor's situation involved a complete abandonment and total termination of service. July 12, 1979 Opinion, at 2, *aff'd*, 633 F.2d 210 (3d Cir. 1980).

In abandonment proceedings under former section 1(18), the ICC has consistently had discretionary authority over the imposition of labor protective conditions. *ICC v. Railway Labor Executives Association*, 315 U.S. 373, 62 S.Ct. 717, 86 L.Ed. 904 (1942). However,

> [i]n a proceeding where a carrier proposes to abandon its entire line of railroad, the imposition of protective conditions normally is not warranted, and would not serve, in most instances, to strengthen the transportation system within the contemplation of the national transportation policy. A departure from this principle in particular cases must be supported by clear and convincing evidence. *Okmulgee Northern Railway Company Abandonment*, 320 ICC 637 (1964); *Manitee & Repton R. Co. Abandonment*, 320 ICC 489 (1964); and *Tennessee Central Railway Company Abandonment*, 333 ICC 443 (1968).

*Bush Terminal Railway Company Entire Line Abandonment*, 342 ICC 34, 51 (1971).

In *Bush Terminal*, the ICC noted that although some employees would be adversely affected by abandonment, the railroad was in poor financial condition, current liabilities far exceeded current assets, it had a negative shareholder's equity and had been suffering operating losses for a number of years. "Employee conditions cannot reasonably be required in a case where the entire railroad of a carrier is permitted to be abandoned because it cannot make ends meet." 342 ICC at 51.

In *Tennessee Central*, the ICC found that the railroad was a bankrupt business entity unable to meet either its long term or immediate financial obligations; yet, that railroad had provided regular employment for its work force and had paid its employees in full satisfaction of the terms of the collective bargaining agreements. In such circumstances, the Commission found it "neither equitable nor warranted on any ground, to require continued operation for the purpose of providing jobs for the carrier's employees, or to require further consumption of the railroad's properties for the payment of employees after the railroad ceases operation." 334 ICC at 545. Although the Tennessee Central was current in wage payments to its employees, there is no meaningful distinction between that case and the one at bar, as the scheduled wage increases due under collective bargaining agreements have been accrued, and are to be satisfied as priority claims under the Plan. The debtor has been paying its employees throughout this proceeding while the interests of other parties have suffered constant erosion.

█ It should be noted that one of the pre-conditions to the Trustee—New NYS&W—DO contract is the non-imposition of labor protection; thus, if labor protection is imposed on either New NYS&W or DO, the transaction will not occur, and the debtor's former employees now employed by New NYS&W would lose their jobs and still be without protection. This fact is pertinent to the Court's consideration of whether or not labor protection is warranted. *See Chicago, R. I. P. Acquisition*, 290 ICC 696, 699 (1955).

RLEA contends that the discretion which the ICC exercised in determining whether to impose labor protection in cases of abandonment was eliminated by passage of section 802 of the Railroad Revitalization and Regulatory Reform Act of 1976, P.L. 94–210 ("4 R Act"). However, this argument flies in the face of post-4 R Act ICC decisions denying labor protection in total abandonments, and is therefore clearly without merit.

Section 802 of the 4 R Act (90 Stat. 127) was added to the Interstate Commerce Act as section 1a in 1976. Recodification of the Interstate Commerce Act in 1978 accomplished the repeal of section 1a and the placement of that section in new 49 U.S.C. § 10903. RLEA suggests that the language of 49 U.S.C. § 10903(b)(2) operated to deprive the ICC of the discretion over labor protection which it had formerly exercised in cases of complete abandonment. The ICC, however, consistently rejected RLEA's argument in post-4 R Act cases.

In *Wellsville, Addison and Galeton Railroad Corporation—Abandonment of Entire Line*, 354 ICC 744 (1978) the only issue was the imposition of employee protective conditions in the abandonment of an entire line of railroad. In a prior decision in the same case, the Commission had imposed the Oregon Short Line Conditions on the petitioning carrier. *Wellsville, Addison & Galeton Railroad Corp.—Abandonment*, 354 ICC 247 (1978).

On the carrier's petition to the Commission on an issue of general transportation importance, the ICC re-opened the proceeding, and reversed its prior ruling that the Oregon Short Line protections applied to total abandonments. In so doing, the Commission held:

The precise language of section 1a(4) of the Act [now 49 U.S. 10903(b)(2)] would appear to require imposition of employee protective conditions in all permitted abandonments. However, the legislative history of the 4 R Act and prior Commission precedent is clearly to the contrary. In the report of the Committee of Conference on the Railroad Revitalization & Regulatory Reform Act of 1976, H.R. Report 94–781, p. 218–19, Congress indicated that the precise language of section 1a(4) was not intended to change the policy and practice of the Commission in connection with certificates involving total termination of service by a railroad company.

Prior Commission precedent in this area is well established. Employee protective conditions have not been imposed in cases involving complete abandonment of operations, because the Commission found it unwarranted to require further consumption of a railroad's properties for the payment of employees after the railroad ceases operations. *Okmulgee Northern Railway Company Abandonment*, 320 ICC 637 (1964); *Tennessee Central Railway Company Abandonment*, 333 ICC 443, 454 (1968).

*Wellsville*, 354 ICC at 746.

In *Northampton & Bath Railroad Company Abandonment*, 354 ICC 784 (1978) the Commission again was faced with the issue whether employee protective conditions should be imposed in an entire line abandonment. In *Northampton & Bath*, RLEA offered the same argument which it makes to this Court, to wit, that section 1a(4) of the Interstate Commerce Act, as amended by the Railroad Revitalization and Regulatory Reform Act of 1976 (4 R Act) requires the imposition of employee protective conditions in an entire line abandonment. 354 ICC at 785. In *Northampton & Bath*, the Commission relied on *Wellsville, supra*, and the legislative history of the 4 R Act, and reaffirmed its determination that despite passage of the 4 R Act,

Congress did not intend to curtail the Commission's discretion regarding protective conditions in entire line abandonments.

After the entire line of a railroad is abandoned, no operating carrier remains to enjoy the benefits of the abandonment or pay the costs of employee protection. The Commission has generally refused to impose employee protective conditions which would in effect, require continued operation for the benefit of employees or further consumption of a failed railroad's properties for payment of employees' benefits after operations cease. The conditions imposed by the review board, those developed in Oregon Short Line, are not appropriate for an entire line abandonment where the abandoning railroad has no rail carrier affiliate which continues operations similar to its own.

354 ICC at 785–786 (footnotes omitted).

There is additional pertinent legislative history which supports that relied upon by

the Commission in the *Wellsville* and *Northampton* decisions. Senate Conference Report No. 94–595, a joint statement of the House and Senate managers of the 4 R Act, (see 2 U.S.Code Cong. & Admin.News, pp. 14, 148 (1976)) states that new section 1a of the Interstate Commerce Act (now 49 U.S.C. § 10903)

> required employee protection no less beneficial than that established under section 5(2)(f) of the Interstate Commerce Act and section 405 of the Rail Passenger Service Act *but without intention to change the policy and practice of the Commission in connection with certificates involving total termination of service by a railroad company.*" (Emphasis Added)

2 U.S.Code Cong. & Admin.News, p. 233 (1976).

Furthermore, the ICC has qualified the applicability of the Oregon Short Line conditions in a ruling issued in that very proceeding. *Oregon Short Line Railroad and Union Pacific Railroad Company—Abandonment* (Goshen Branch) 360 ICC 666, 667 (1980). In that decision, the Commission noted that the Oregon Short Line conditions, 360 ICC 91, which RLEA has asserted apply to this case "*will apply in all rail abandonment proceedings, except for entire line abandonments.*" (Emphasis added) 360 ICC at 667. Of course, the *New York Dock* conditions *a fortiori* do not apply here, as *New York Dock* involved a section 5(2) case, of the merger/acquisition type.

With the important distinction between partial and total abandonments established, *People of the State of Illinois v. United States*, 604 F.2d 519 (7th Cir. 1979), cited by RLEA for the proposition that the ICC was deprived of the discretion whether to impose labor protection after the 4 R Act, is proven to be inapplicable to the facts of the instant case. *People of Illinois* dealt with the Baltimore and Ohio Railroad's application to abandon only a 73.27 mile branch line; it did not involve the complete abandonment of B&O's entire system. Therefore, the quotation relied upon by RLEA (Memorandum, p. 13) is nothing more than

*dictum*, and has no application to a case of total abandonment, such as the within matter. *See Oregon Short Line*, 360 ICC at 667. It is clear that the *People of Illinois* Court was not addressing the issue before either this Court, or the *Rock Island, supra*, reorganization court.

The Milwaukee Act, which shifted the authority over labor protection issues from the Commission to the reorganization court "intends to make no change in existing law as it affects employee protection." H.R. Conference Rpt. No. 96–583, 1979 U.S.Code Cong. & Admin.News, pp. 1742, 1759; *Rock Island*, No. 75–B–2697, Order No. 248; *ICC Report, Chicago, Rock Island and Pacific Railroad Company—Abandonment—Entire System*, Docket No. AB–46 (Sub No. 22) (May 23, 1980); ("*Rock Island Abandonment*") *see Chicago, Milwaukee, St. Paul and Pacific Railroad Company*, No. 77–B–899 (U.S. District Court, Northern District of Illinois, filed February 29, 1980).

In *Rock Island Abandonment*, the ICC recommended to the reorganization court that the Trustee of that railroad be permitted to abandon all lines and discontinue all operations. In discussing the question of labor protection, the ICC noted that although the New York Dock conditions could be imposed on the Rock Island, "another viable option is not to impose any form of labor protection. In past instances where entire rail systems have been abandoned and no company would reap the benefits of the abandonment, we have found the imposition of employee protective conditions not to be warranted." *Rock Island Abandonment*, at 16–17.

The question of what, if any, labor protection should be imposed in a complete abandonment under the Milwaukee Act came before the District Court with jurisdiction of the Rock Island. After noting that Rock Island's unconditional discontinuance of service and its total system abandonment was constitutionally mandated under the *Brooks-Scanlon* doctrine, the court ruled that labor protective conditions or arrangements are not required of Rock Island's estate pursuant to section 17 of the

Milwaukee Act. The court relied on Rock Island's system-wide termination of operations and total line abandonment, "which do not warrant further consumption of Rock Island's assets for protection payments to employees whose jobs with Rock Island are no longer in existence by reason of such total abandonment and operational discontinuance." *Rock Island*, Order No. 248. The *Rock Island* court found that ICC precedent, the Rock Island's constitutional right to abandon its lines and discontinue its service, and the equities of the situation all mitigated against the imposition of labor protective arrangements.

■ The facts of *Rock Island* are strikingly similar to the circumstances which obtain here. This Court also has held that it was constitutionally impermissible for this debtor to continue operations, and ordered abandonment and cessation of service. Since January of 1976, this estate has continuously suffered operational losses which have eroded the collateral of creditors; nevertheless, employees have continued to be paid. Furthermore, those employees are asserting claims for unpaid wage accruals as priority expenses of administration, which, if allowed, must be paid out of the collateral of the secured creditors. This is a total system abandonment, and no parent or affiliate of the abandoning carrier will reap the benefits of the abandonment. Consistent with all existing precedent on this point, the imposition of labor protective provisions on the estate of this debtor is not warranted.

The recently enacted Staggers Rail Act of 1980, deregulating certain aspects of the railroad industry, does not affect the foregoing legal analysis regarding labor protection. In fact, the legislative history of the Staggers Act makes it clear that in an abandonment setting, Congress did not intend to impose labor protection conditions on a Class III carrier such as the debtor was, or DO and New NYS&W are. In a discussion of the Staggers Act in the House, the following colloquy occurred:

Mr. Lee: Mr. Chairman, in the Stagger-Rahall-Lee amendment, there is clarification of congressional intent with regard to abandonments under the Milwaukee Act. There is one ambiguity in the language that I would like to have clarified at this time.

The amendment refers to "major" rail carriers. It is my understanding that the thrust of this amendment is to address the specific situation in the Midwest which gives rise to the Milwaukee and Rock Island Acts. The word "major" does not have a specific meaning in the law and history of the Interstate Commerce Commission. I understand that this amendment is directed to major or larger carriers—that is, class I carriers such as the Rock Island. Is my understanding correct?

Mr. Florio: The gentleman is correct.

Mr. Lee: I thank the gentleman from New Jersey. There is a great deal of law and legislative history and administrative history relating to the subject of labor protection. My major involvement in this legislation has been to insure that the small class II and class III carriers who are such an important part of our national railroad system will benefit and not be harmed by deregulation legislation. With much of our railroad industry in trouble, one answer in continuing service on troubled major railroads is going to be development of light density railroads. One carrier that operates in upstate New York, northern Pennsylvania and northern New Jersey, the Delaware Otsego System, operates several lines as independent shipper controlled railroads that would otherwise be lost to the rail system. Our congressional policy is to encourage transactions involving class III carriers especially in situations where the alternative to continuation of service may well be liquidation of service.

Because of the importance of this segment of our railroad system, I feel it is important to clarify that this amendment is making reference to abandonment of class I rail carriers and that the Milwaukee Restructuring Act was intended to impose employee protection on such abandonments and not in cases where there has not traditionally been such protection. I was prepared to offer an amendment to clarify this point, but if the gentleman

can assure me that my understanding is correct, I will not offer the amendment.

Mr. Florio: The gentleman's understanding is correct on the purpose and intent of this amendment.

Mr. Lee: I thank the gentleman. Mr. Madigan do you agree?

Mr. Madigan: I agree.

Mr. Lee: Thank you.

Congressional Record, September 9, 1980, at p. H 8555.

This history of the Staggers Act only reinforces this Court's conclusion that imposition of labor protection provisions in this case is unwarranted.

For the foregoing reasons, RLEA's request for the imposition of labor protective provisions upon any party (including the Debtor, the Trustee and New NYS&W) is denied.[3] The Plan need not be modified to incorporate any such provisions. The Trustee should submit an Order consistent with this opinion within seven (7) days.

**3.** Having concluded that this Court, in its discretion, need not impose labor protection provisions, I need not reach other intriguing issues such as:

(a) are there any employees entitled to protection as "displaced" or "dismissed" employees adversely affected by the abandonment?

(b) were pre-August 29, 1980 layoffs justified?

(c) do the releases constitute a bar to any employee seeking labor protection relief or is this issue, as RLEA contends, one requiring arbitration?

(d) if labor protection provisions were imposed, what priority, if any, should be given to payments to protected employees? *See, e. g., Reading Company v. Brown,* 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968).